E-FILED
Wednesday, 30 September, 2026 09:47:40 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

NICO GAY,

Plaintiff,

v.

CITY OF ROCK ISLAND, ADAM BRADLEY, BRIEANNE LONERGAN, ANDREW LAWLER, THOMAS DANHOF, and BRIAN KOZAK,

Defendants.

Case No. 4:25-cv-04193-SLD-RLH

ORDER

Before the Court is Defendants the City of Rock Island ("the City") and Officers Adam Bradley, Brianne Lonergan, Andrew Lawler, Thomas Danhof, and Brian Kozak's ("the Officers") motion to dismiss Plaintiff Nico Gay's amended complaint, ECF No. 20.[1] For the following reasons, Defendants' motion to dismiss is GRANTED.

**BACKGROUND**[2]

## I. Facts of the Case

Gay is a lawful firearm owner and possesses a concealed carry license ("CCL"). At all times relevant, Bradley worked as a sergeant with the Rock Island Police Department ("RIPD"); Lonergan, Lawler, and Danhof were RIPD patrol officers; and Kozak worked as a detective with RIPD. Gay alleges that the Officers wrongfully arrested and later prosecuted him in violation of

[1] Defendants' motion to dismiss Gay's original complaint, ECF No. 7, is also pending but is MOOT since Gay filed an amended complaint. *See* Civil LR 7.1(E).

[2] When ruling on a motion to dismiss, the Court takes all of the complaint's well-pleaded allegations as true and views them in the light most favorable to the plaintiff. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012). Unless otherwise noted, the facts set forth are taken from the amended complaint, ECF No. 15.

his constitutional rights. He was initially arrested for Aggravated Discharge of a Firearm[3] but ultimately charged with Possession of a Firearm in a Prohibited Area, 430 ILCS 66/65(a). 430 ILCS 66/65(a) makes it unlawful for someone with a CCL to "knowingly carry a firearm on or into" a myriad of areas, including, as relevant here, "[a]ny building, real property, and parking area under the control of an establishment that serves alcohol on its premises, if more than 50% of the establishment's gross receipts within the prior 3 months are from the sale of alcohol," *id.* § 66/65(a)(9), and "[a]ny building or real property that has been issued a Special Event Retailer's license" for the sale of alcohol, *id.* § 66/65(a)(11). The prohibited areas enumerated under 430 ILCS 66/65 must display signs which state that firearms are prohibited "clearly and conspicuously . . . at the entrance of a building, premises, or real property." *Id.* § 66/65(d).

**a. The Shooting**

Around 2:02 a.m. on October 29, 2023, shots were fired in the Arts Alley of downtown Rock Island, Illinois, across the street from The Gathering. Gay, wearing a yellow, black, and white coat, was walking in front of The Gathering when he heard the gunshots. He crouched behind a car for cover, drew his handgun, pointed it at the ground, and looked in the direction of the gunshots.

**b. The Ensuing Investigation**

At 2:03, Lawler radioed that he observed a black sedan fleeing south. Two witnesses then informed him that there was a man, wearing a yellow jacket, inside a bar with a gun and they pointed toward The Gathering. One of the witnesses also stated that when the man in the yellow jacket heard the gunshots, he pulled out a gun. When asked, neither witness could

---

[3] At times, the parties refer to this as "aggravated discharge of a weapon," *see generally* Am. Compl. No party provides a citation to the applicable statute; however, the Court believes it to be 720 ILCS 5/24-1.2, and so will refer to this offense by its proper name, "aggravated discharge of a firearm."

identify the shooter, but they noted that a man in a white hoodie and another in a yellow hoodie were present. A minute later, a third witness pointed at The Gathering and told Lawler and Lonergan that someone in a yellow jacket or shirt had a gun. The witness stated that their son had a video.

Around 2:06, Lawler and Lonergan approached The Gathering. Lonergan attempted to open the door but could not because it was locked. She commented that The Gathering "could not lock the door, and referenced that [it] had a liquor license." Am. Compl. ¶ 25, ECF No. 15. The owner opened the door at 2:07. Lawler asked if anyone inside had a yellow coat and the owner said no. Lonergan then informed him that, because the business had a liquor license, the Officers needed to conduct a walk through. There was no signage posted or visible announcing the prohibition against firearms, nor did Lawler or Lonergan take any measures to confirm that The Gathering was such an area, like by conducting a revenue verification or reviewing receipts.

As Lawler and Lonergan walked through The Gathering, Gay was approaching the back exit. Lonergan stopped him and directed him to show his hands. Gay complied and asked what was happening. Lawler stated he was going to pat Gay down, and someone at the bar said "[t]his ain't the dude you looking for," Gay said "[w]rong person," and Lawler replied "I know . . . just chill." *Id.* ¶ 28 (quotation marks omitted). At 2:08, Lawler handcuffed Gay. Bystanders continued to inform him that Gay was not the correct person.

Gay told Lonergan that he had CCL information in his wallet and asked her to confirm. Lonergan went into his wallet and Lawler asked whether Gay had a permit. Gay again stated that he had a CCL. "Lawler told [Gay] words to the effect that once concealed carry was checked, [Gay] was good." *Id.* ¶ 33 (quotation marks omitted). Lonergan radioed and requested confirmation of Gay's firearm owner identification ("FOID") and CCL status. She learned that

he had both an active FOID and CCL. Gay also told Lawler to check the rounds in his firearm, to which Lawler responded "that no one was saying [Gay] shot, only that someone saw [him] with a gun." *Id.* ¶ 34. When a bystander asked if Gay was being arrested, Lonergan said he was being detained. While Gay was handcuffed, Lonergan pushed Gay's stepmother and said "[g]et out of my face," later telling Gay that his family was "making it worse." *Id.* ¶ 39 (quotation marks omitted). At 2:13, Gay, still handcuffed, was placed into a police car. Lawler removed and secured Gay's gun, then told him that they were investigating because someone described Gay walking in with a gun and said he shot the gun. Lonergan mirandized Gay, who asked to speak with a lawyer. Lonergan acknowledged the request.

Meanwhile, around 2:06 in the Arts Alley, a witness pointed out a casing to Bradley. Bradley spoke with the witness, "who described two individuals (a yellow hoodie and a white hoodie/white hat) and stated they went into 'the bar right here.'" *Id.* ¶ 26. The owner of El Toro Loco, a nearby establishment, also showed Bradley a cellphone video of the shooting. Gay could be seen crouching behind a car with his gun pointing down at the time the owner indicated shots were being fired. After viewing the video,[4] Bradley directed RIPD Officer Jeffrey Ronk to "obtain the witness's information and address the witness video that Bradley had just watched." *Id.* ¶ 35. Ronk took photos of a cell phone video of Gay with a gun, pointed down, and the owner of El Toro Loco, who recorded the video, confirmed that he did not see Gay shoot the gun. At 2:11, Bradley showed Danhof photos he had taken of the witness's video and stated "[h]ere's the suspect." *Id.* ¶ 36 (quotation marks omitted). They then entered The Gathering and its owner informed them that Gay was his cousin, had a FOID and CCL, and was not involved in the shooting.

[4] It is unclear exactly which video Bradley was discussing, but the Court presumes he was referring to the owner of El Toro Loco's video.

At 2:16, Lonergan asked Lawler, "[y]ou . . . can't have a gun in a bar, right?" *Id.* ¶ 44 (quotation marks omitted). Then Lawler called Bradley and told him that the individual in yellow with a gun was in custody. Bradley said that person was a suspect and that "Ronk says they got a video of him, with the gun and possibly shooting too." *Id.* ¶ 45 (quotation marks omitted). A minute later, Lawler told Sheriff Luxmore "I don't know exactly what charges we have on him yet." *Id.* ¶ 46 (quotation marks omitted).

At 2:19, the owner of Icons Martini, another nearby business, told Lonergan that he heard gunshots and described the suspect as wearing a white coat. Bradley approached during this conversation and, shortly after, told Lonergan that "[w]e got a good video for tonight." *Id.* ¶ 48 (quotation marks omitted). According to body camera footage, at no point prior to Gay's booking did Lonergan tell Bradley, Lawler, or Danhof that the Icons Martini owner described the suspect as wearing a white coat.

At 2:21, Bradley spoke with Officer Young on the phone. Young told Bradley that witnesses at or near the bus station identified the shooting suspects as arriving in a black vehicle and fleeing in a silver vehicle.

At 2:22, the owner of The Gathering told Danhof that, after four years, he had just obtained a liquor license. Around 2:30, Danhof interviewed a witness in the Arts Alley who described one person in a white hoodie and one in a yellow hoodie, stating that he was not sure which person fired the gun and that he could not identify the shooter. Danhof shared the information with Bradley. Danhof, Bradley, and Lawler proceeded to discuss the information collected from witnesses. Lawler asked, "[h]e said a guy in a yellow hoodie [was the shooter]?" Danhof responded, "[y]eah a guy in a yellow hoodie and a guy in a white hoodie were over here and the guy . . . both pulled guns out and the guy in the yellow hoodie shot the gun." Lawler

replied, "[t]he guy I got has like a yellow, black, and white jacket." Danhof replied "[y]eah, he said it was that one." When Lawler subsequently asked, "[o]h, he said it was the same guy?" Danhof said yes, and charging instructions were given. *Id.* ¶ 68 (quotation marks omitted). Also during this conversation, Danhof said that the witness saw Gay shooting the gun despite the witness's uncertainty.

Lawler informed Lonergan that a video was supposed to be sent to him in order to determine whether Gay was the suspect in the video. Lawler then saw the photo Bradley took of the witness's video of the shooting, which showed Gay crouching behind a car with his gun pointed down. Lawler confirmed the photo was of Gay and Lonergan agreed. Immediately after, at 2:22, the Officers moved Gay into Lonergan's vehicle and searched him.

Bradley called Lawler, asking whether Gay had been mirandized and if he would speak with a detective. Gay reiterated that he wanted a lawyer and Lawler relayed this to Bradley. Ronk approached Lawler and discussed videos of the shooting and photos of the suspect. When a bystander asked if Gay was the suspect, Lawler replied that Gay was under arrest. Danhof asked who Lawler arrested, to which Lawler responded "the suspect with the gun," stated that he detained Gay as Gay attempted to leave through The Gathering's back entrance, and referenced that Bradley's photo matched Gay. *Id.* ¶ 59 (quotation marks omitted).

Lonergan arrived at the county jail with Gay at 2:26. Meanwhile, the other officers discussed the bus station witness accounts, which identified arrival in an abandoned black vehicle and flight in a silver one.

At 2:27, Gay again requested an attorney and declined to speak with a detective. Lonergan "then explained why [Gay] was detained and arrested saying 'Some witnesses put you with a gun on scene, so that's why you were being detained and arrested, Okay?'" *Id.* ¶ 62. She

also stated that he was being arrested because he was "on camera with the gun," and "we have you at the scene of a shooting with a gun on video." *Id.* (quotation marks omitted).

At 2:31, Lonergan called Bradley and asked what to charge Gay with, ultimately confirming they were "just on standby." *Id.* ¶ 64 (quotation marks omitted). After this conversation, her body camera audio was muted while charging decisions were discussed and Gay remained in custody. Around 2:33, Lonergan asked Gay if he was related to an individual named Nekai.

At 2:36, Bradley called Lonergan, instructing her to ask Gay if he would speak to a detective and, if he said no, to charge him with "aggravated." *Id.* ¶ 70 (quotation marks omitted). Lonergan asked Gay about talking with a detective. He declined, and Bradley told Lonergan to charge him. Ronk then joined the conversation and, during this discussion immediately preceding Gay's booking, several of the body camera's audios were muted despite the cameras continuing to record. Around 2:40, Lonergan took Gay into the jail garage and he entered the jail for booking.

Around 2:45, Kozak was directed to respond. He met with Bradley for a briefing on the shooting. Around 2:51, Lonergan and Lawler met in the parking lot, during which time Lonergan used derogatory terms about Gay's stepmother. Lawler stated they would "suspend [The Gathering's] liquor license, [they]'ll drop the charge against him." *Id.* ¶ 77 (quotation marks omitted).

Around 4:24, Kozak met with Gay at the jail, mirandized him, and asked if he would talk. Gay repeated his request for a lawyer and asked if he was still being charged. Kozak informed Gay that he had been arrested for aggravated discharge of a firearm but would actually be

charged with possessing a gun in a prohibited area. Kozak also asked Gay if he was related to an individual named Nekai and referenced a prior shooting with which Nekai was involved.

Gay was released with a notice to appear for a charge under 430 ILCS 66/65(a)(11) and his firearm was retained.

**c. The Prosecution**

On November 6, 2023, a complaint was filed in case 2023CM355. Probable cause was found.[5] On December 4, 2023, Gay appeared and entered a not guilty plea. At some point, his charge was updated from 430 ILCS 66/65(a)(11) to 430 ILCS 66/65(a)(9).

On July 16, 2024, the charge was dismissed with leave to reinstate. Two days later, Gay contacted Kozak to retrieve his firearm. Kozak reached out to Assistant State's Attorney Williams and learned that the case was dismissed due to an inability to "determine[] that The Gathering was collecting revenue from alcohol sales only." Am. Compl. ¶ 88. That same day, Williams advised Kozak that the firearm could not be returned until thirty days after the charges were dismissed. Kozak contacted Samantha Gange, the Rock Island County Clerk. She told Kozak that The Gathering was granted a liquor license on September 25, 2023, and it would not expire until April 30, 2024. She also stated that The Gathering was only open for one day—the day of the shooting. Gange forwarded the liquor license to Kozak. On July 24, 2024, an order to return Gay's firearm was entered.

On July 28, 2024, Kozak printed a supplemental report detailing his discussions with Williams and Gange. On July 31, 2024, an information was filed in case 2024CM307, again charging Gay with a violation of 430 ILCS 66/65, although the specific subsection is unclear. A

[5] The amended complaint provides a filing date of November 11, 2023, *see* Am. Compl. ¶ 84; however, Gay filed a Notice of Errata, ECF No. 23, which corrects the date to November 6, 2023.

judge found probable cause on July 31, 2024. On June 3, 2025, this second case was dismissed without leave to reinstate.

## II. Procedural History

Gay filed his first complaint on October 29, 2025. *See* Compl., ECF No. 1. Defendants jointly filed their first motion to dismiss on January 26, 2026. Jan. Mot. Dismiss, ECF No. 7. In response, Gay timely filed an amended complaint. The amended complaint contains five counts. Under the Fourth Amendment and 42 U.S.C. § 1983, Gay brings three counts against the Officers: unreasonable seizure/false arrest (Count I); malicious prosecution/unreasonable seizure (Count II); and failure to intervene (Count IV). Against the City, he brings two further counts: municipal *Monell* liability under 42 U.S.C. § 1983 (Count III) and indemnification under 745 ILCS 10/9-102 (Count V). Defendants again jointly move to dismiss the amended complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). *See generally* Mot. Dismiss. Gay timely filed a response resisting dismissal. *See generally* Resp., ECF No. 22.

# DISCUSSION

## I. Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *id.* 12(b)(6) (noting a court will dismiss a complaint if it fails to state a claim upon which relief can be granted). When deciding on a motion to dismiss for failure to state a claim, "[t]he complaint's well-pleaded factual allegations, though not its legal conclusions, are assumed to be true," *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013), and the court must "draw all inferences in the light most favorable to the nonmoving party," *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014). While "detailed factual allegations are unnecessary, the complaint must have 'enough facts to

state a claim to relief that is plausible on its face.'" *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277–78 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

It is possible for a plaintiff to "'plead himself out of court by pleading facts that show he has no legal claim.'" *Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 989 (N.D. Ill. 2024) (quoting *Epstein v. Epstein*, 843 F.3d 1147, 1150 (7th Cir. 2016)). This can be done "by pleading 'all the ingredients of an impenetrable defense.'" *Id.* (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).

## II. Analysis

### a. Claims Against the Officers

#### i. Section 1983

Gay brings three § 1983 claims against the Officers: false arrest (Count I); malicious prosecution (Count II); and failure to intervene (Count IV). Am. Compl. 17–25. 42 U.S.C. § 1983 provides a private right of action for individuals whose constitutional rights have been violated by state actors. To state a claim under § 1983, a plaintiff must plead that "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the activity deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Case v. Milewski*, 327 F.3d 564, 566 (7th Cir. 2003). The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. This includes protection against false arrest and malicious prosecution. *See, e.g.*, *Lee v. Harris*, 127

F.4th 666, 672–76 (7th Cir. 2025) (discussing Fourth Amendment false arrest and malicious prosecution claims).

### 1. Count I: False Arrest

To succeed on a Fourth Amendment false arrest claim, "a plaintiff must show that there was no probable cause for his arrest." *Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (quotation marks omitted). Defendants argue that the amended complaint alleges the existence of probable cause to arrest Gay,[6] although they do not identify for which offense probable cause existed. Mot. Dismiss 5–8. Gay responds that the amended complaint does not allege probable cause. Resp. 2. Instead, he argues that "[p]robable cause is not established as a matter of law where a complaint plausibly alleges that officers possessed plainly exculpatory information yet proceeded by mischaracterizing or omitting that information" and asserts that the amended complaint alleges that the Officers already knew exculpatory information when they converted Gay's detention into an arrest. *Id.* at 3.

"Probable cause exists at the time of an arrest if the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing that the suspect has committed, is committing, or is about to commit an offense." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (quotation marks and alterations omitted). Probable cause is objective, *Whren v. United States*, 517 U.S. 806, 813 (1996), and "deals not with hard certainties but with probabilities," *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013). It is based on the information available to the officer at the time an arrest is effectuated, not on information learned later. *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994).

---

[6] Defendants also argue that qualified immunity supports dismissal of Gay's § 1983 claims, Mot. Dismiss 17–20; however, the Court need not determine the applicability of qualified immunity because of its conclusion that probable cause existed.

When a police officer "cause[s]" an arrest without probable cause, he "may be held liable for a violation of the Fourth Amendment." *Richardson v. City of Chicago*, No. 1:22-CV-06456, 2025 WL 919520, at *3 (N.D. Ill. Mar. 26, 2025) (emphasis omitted); *Acevedo v. Canterbury*, 457 F.3d 721, 723 (7th Cir. 2006) ("A police officer who files a false report may be liable for false arrest if the filing of the report leads to a seizure in violation of the Fourth Amendment, even if he did not conduct the arrest himself."); *Glass v. Village of Maywood*, No. 22 C 164, 2024 WL 4007643, at *5 (N.D. Ill. Aug. 30, 2024) (holding that a non-arresting officer may still be liable for false arrest if he "undert[ook] some action prior to, or perhaps at the time of, [the] order to arrest" in such a way that the officer "directly caused or participated in the alleged constitutional deprivation" (quotation marks omitted)).

Probable cause existed to arrest Gay for Possession of a Firearm in a Prohibited Area in violation of 430 ILCS 66/65(a). Under that statute, a licensee, defined as "a person issued a license to carry a concealed handgun," *id.* § 66/5, is prohibited from (1) knowingly (2) carrying a firearm (3) on or into several enumerated locations, including (i) "[a]ny building, real property, and parking area under the control of an establishment that serves alcohol on its premises, if more than 50% of the establishment's gross receipts within the prior 3 months is from the sale of alcohol," *id.* § 66/65(a)(9), or (ii) "[a]ny building or real property that has been issued a Special Event Retailer's license" for the sale of alcohol, *id.* § 66/65(a)(11). Gay, who possessed a valid FOID and CCL, Am. Compl. ¶ 7, was a licensee. The Officers had probable cause to believe Gay knowingly carried a firearm into the Gathering: several witnesses described one of the people involved as wearing a yellow jacket or hoodie, which easily could have described Gay's yellow, black, and white jacket, *id.* ¶¶ 20, 67; there were photos and videos depicting Gay crouched behind a car with a gun in his hand at the time of the shooting, *id.* ¶¶ 29, 30, 47; and

witnesses told the Officers that a man in yellow, with a gun, went into The Gathering, *id.* ¶¶ 19, 23, 26 (noting a witness description of an individual with a yellow hoodie who went into the Gathering). And the Officers had probable cause to believe that The Gathering was an establishment with over half of its gross receipts coming from alcohol sales because multiple witnesses identified The Gathering as a bar, *see, e.g.*, *id.* ¶¶ 19, 26. Moreover, while Lawler and Lonergan searched Gay, the owner of The Gathering told Danhof that he had just obtained a liquor license. *Id.* ¶ 54. This is more than sufficient to establish probable cause to arrest Gay for possession of a firearm in a prohibited place. *Cf. People v. Lyke*, 2021 IL App (1st) 170371-U, ¶¶ 32–33 (finding that, despite a lack of evidence regarding gross receipts, an officer had probable cause to believe that the defendant committed an illegal act when a witness told her that the defendant had attempted to enter a nightclub with a gun).

To the extent Gay argues that Defendants did not sufficiently investigate whether The Gathering qualified as a prohibited establishment under the statute, *see, e.g.*, Am. Compl. ¶ 25; Resp. 3 (arguing that there was no probable cause in the absence of an "element-based predicate verification"), he imposes too high of a burden upon probable cause. "[P]robable cause demands even less than probability; it requires more than a bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (quotation marks and internal citations omitted). And officers do not have an affirmative duty to investigate—"once an officer learns sufficient trustworthy information establishing probable cause, he is entitled to rely on what he knows in pursuing charges or an arrest, and is under no further duty to investigate." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 744 (7th Cir. 2003). Like how officers "could reasonably assume [a night]club fell within a prohibited

category for possession of handguns," the Officers in this case could reasonably assume that The Gathering fell within a prohibited category without affirmative investigation. *Lyke*, 2021 IL App (1st) 170371-U, at ¶ 33.

Gay also argues that probable cause to arrest him could not have existed because there was exculpatory evidence. Resp. 2–4. However, the evidence Gay characterizes as exculpatory, such as the photos and videos which depict him crouching behind a car with his gun pointed down, does not undercut probable cause for possessing a firearm in a prohibited area. In fact, much of this evidence bolsters the probable cause analysis. That there is evidence of him holding a gun just minutes prior to finding him inside of The Gathering solidifies the Officers' belief that he possessed a firearm when they found him.

Additionally, "the offense for which probable cause exists need not be the subjective offense for which the officer was conducting the arrest. It is enough that probable cause exists as to an offense. . . ." *Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013) (internal citations omitted). Thus, the existence of probable cause for possession in a prohibited area renders irrelevant both the issue of probable cause for aggravated discharge and the fact that Gay was not initially arrested for possession in a prohibited area. *See id.*

**2. Count II: Malicious Prosecution**

Next, Defendants argue that Gay's malicious prosecution claim should be dismissed because (1) probable cause existed, Mot. Dismiss 5–8; (2) nothing in the complaint "establish[es] the required causal connection between the officers' conduct and the prosecution itself," *id.* at 8–9; and (3) Gay's complaint fails to plausibly state a claim because (a) there is no allegation of malice and (b) there is no federal § 1983 malicious prosecution cause of action, *id.* at 9–10. Gay

responds that Defendants' misconduct demonstrates causation, Resp. 5–7, and that there is a federal § 1983 malicious prosecution claim, *id.* at 7.

Gay is correct that a Fourth Amendment § 1983 malicious prosecution cause of action exists. *See generally Thompson v. Clark*, 596 U.S. 36 (2022); *Lee*, 127 F.4th 666. In order to establish a Fourth Amendment malicious prosecution claim, a plaintiff must show that "(1) [a] judicial proceeding was instituted without probable cause; (2) the motive for the proceeding was malicious; and (3) the prosecution ended in the plaintiff's favor."[7] *Lee*, 127 F.4th at 676. The government official against whom the claim is brought must have caused the prosecution. *Chiaverini v. City of Napoleon*, 602 U.S. 556, 558 (2024). Malicious prosecution claims should be considered "charge by charge" because, unlike false arrest claims in which plaintiffs can only succeed if probable cause does not exist for all offense conduct, malicious prosecution plaintiffs can succeed if any charge advanced was baseless. *Id.* at 562. To plead malicious prosecution, a plaintiff must "do more than state conclusively that the defendants maliciously prosecuted him"—"[h]e must allege some action that supports the conclusion that a malicious prosecution occurred." *Sneed v. Rybicki*, 146 F.3d 478, 481 (7th Cir. 1998).

Gay has plausibly alleged that both prosecutions ended in his favor. Each case was dismissed and ended without a conviction. Am. Compl. ¶¶ 86, 97; *see Thompson*, 596 U.S. at 39 ("To demonstrate a favorable termination of a criminal prosecution . . . , a plaintiff need only

---

[7] It is unclear whether there is also a fourth element to a Fourth Amendment malicious prosecution claim requiring that the Plaintiff be seized as a result of their prosecution. "Although the Supreme Court has recognized a Fourth Amendment claim for a (pre-legal-process) arrest (i.e., a false arrest), it is unclear if such an arrest can form the basis of a Fourth Amendment claim of malicious prosecution." *Neita v. City of Chicago*, 148 F.4th 916, 939 (7th Cir. 2025) (quotation marks and internal citation omitted) (discussing *Thompson*, 596 U.S. at 42 n.1). However, in *Thompson*, the Supreme Court noted that a plaintiff "presumably would not have to prove that he was seized as a result of the malicious prosecution" if the § 1983 claim were brought under the Due Process Clause rather than the Fourth Amendment, as Gay has here. 596 U.S. at 43 n.2. The Court need not determine whether to apply this fourth element because Gay's allegations fail to plausibly allege an absence of probable cause and the existence of malice, which would be fatal to his malicious prosecution claim whether brought under the Fourth Amendment or the Due Process Clause.

show that his prosecution ended without a conviction."). Nevertheless, the complaint must be dismissed because it does not plausibly allege causation as to Bradley, Longeran, Lawler, or Danhof, nor that Kozak acted with malice.

"[A] person can be liable for commencing or continuing a malicious prosecution even if that person does not ultimately wield prosecutorial power or actively deceive prosecutors" because "liability for malicious prosecution extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present." *Beaman v. Freesmeyer*, 131 N.E.3d 488, 499 (Ill. 2019) (quotation marks omitted).[8] Thus, liability depends on how instrumental of a role the defendant played in the prosecution. *Id.* "[A]n indictment typically breaks the chain of causation, so the plaintiff must show some postarrest action [by the officer] which influenced the prosecutor's decision to indict," *Williams v. City of Chicago*, No. 22 CV 3773, 2023 WL 6388891, at *9 (N.D. Ill. Sep. 29, 2023), such as "presentation of false statements, or . . . withholding exculpatory information from the prosecutor," *Beaman*, 131 N.E.3d at 499 (alteration and quotation marks omitted). In essence, the defendant's conduct must be "both the cause in fact and a proximate cause of" the criminal

---

[8] The availability of Fourth Amendment malicious prosecution is quite new in the Seventh Circuit. *See Manuel v. City of Joliet*, 580 U.S. 357, 370–72 (2017) (recognizing a Fourth Amendment claim challenging "post-legal-process pretrial detention"); *Thompson*, 596 U.S. at 42–43 (clarifying that *Manuel* recognizes Fourth Amendment malicious prosecution claims). Prior to *Manuel*, the Seventh Circuit clearly held that "satisfying the elements of the state-law tort of malicious prosecution, far from being the foundation of a constitutional tort . . . *knocks out* any constitutional tort of malicious prosecution, because, when a state-law remedy exists," the Supreme Court concludes that the Due Process Clause has not been violated. *Newsome v. McCabe*, 256 F.3d 747, 750–51 (7th Cir. 2001) (emphasis in original). As such, Indiana was the only state from which the Seventh Circuit considered federal malicious prosecution claims. *See, Belcher v. Norton*, 497 F.3d 742, 751–53 (7th Cir. 2007) (finding that Indiana tort law did not provide an adequate state law remedy). When federal courts reviewed Fourth Amendment malicious prosecution claims arising in Indiana, they consistently relied on state case law to assist in analyzing the viability of the claim. *See, e.g.*, *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014) (requiring a plaintiff to plead both a constitutional violation and elements of the underlying state law malicious prosecution claim); *Howlett v. Hack*, 794 F.3d 721, 727–29 (7th Cir. 2015) (same). Because of the similarities between state law malicious prosecution claims and Fourth Amendment malicious prosecution claims and the relatively sparse Seventh Circuit case law reviewing a Fourth Amendment malicious prosecution claim, the Court considers Illinois cases to guide its analysis of whether Gay has plausibly alleged the federal claim. Other courts have done the same. *See, e.g.*, *Gonzalez v. Village of Summit*, No. 24 C 11448, 2026 WL 2517227, at *5–6 (N.D. Ill. Aug. 26, 2026) (considering state and federal malicious prosecution together).

proceedings. *Id.* at 500. One's conduct is a proximate cause when they "play[] a significant role in the plaintiff's prosecution." *Id.*

In this case, the only alleged post-arrest conduct by Bradley, Lonergan, Lawler, or Danhof are "officer reports, witness-summary communications, and charging-related communications that materially overstated inculpatory facts and omitted exculpatory context known on scene and reflected in [body camera footage] and the officers' own contemporaneous observations." Am. Compl. ¶ 188. When construing these allegations liberally as the Court must, there are no plausible allegations that the four Officers "knowingly provide[d] misinformation to the prosecutor, conceal[ed] exculpatory information, engage[d] in wrongful or bad-faith conduct instrumental in the initiation of the prosecution, or participate[d] in the case so actively as to amount to advice and cooperation." *Williams*, 2023 WL 6388891, at *9. "While true that "[w]hen an officer's investigatory materials contain knowing misstatements and were clearly in the prosecution's possession, the misstatements have caused the resulting prosecution if they were pertinent to the decision to prosecute," it is too speculative to say that the Officers' alleged failure to report all possibly exculpatory evidence from that night in their police reports and communications with one another were "pertinent to the decision to prosecute" Gay. *Soto v. Monge*, 735 F. Supp. 3d 792, 804 (W.D. Tex. 2024) (quotation marks omitted). This is particularly true since the charged offense, unlawful possession, is unrelated to the allegedly misconstrued facts, which supported Gay's argument that he never shot the gun. In sum, Gay's malicious prosecution claim does not plausibly allege causation against Bradley, Lonergan, Lawler, or Danhof. *Cf. Sopron v. Cassidy*, No. 19-cv-08254, 2022 WL 971563, at *10 (N.D. Ill. Mar. 31, 2022) (denying a motion to dismiss because the facts alleged allow an inference of

malice when the defendants were alleged to have participated in coercing false testimony and agreeing to use false evidence in order to arrest, detain, and prosecute the plaintiff).

The causation analysis, however, reaches a different result for Kozak. After learning from Williams that the charge against Gay was dismissed because "it was unable to be determined that The Gathering was collecting revenue from alcohol sales only," Kozak contacted Gange, the Rock Island County Clerk. Am. Compl. ¶¶ 88, 90. Gange informed Kozak that The Gathering possessed a liquor license and, at his request, sent it to him. *Id.* ¶ 91, 93. Kozak then prepared a supplemental report with this information and, three days later, Gay was again charged under 430 ILCS 66/65. *Id.* ¶¶ 95–96. Gay has plausibly alleged that Kozak's actions—seeking out the liquor license and preparing a supplemental report reflecting his findings—were both the but-for cause and the proximate cause of the second case being filed. *See Beaman*, 131 N.E.3d at 500 ("[L]iability for malicious prosecution requires an examination of whether the defendant's conduct is both the cause in fact and a proximate cause of the commencement or continuation of the original criminal proceedings. . . . In determining whether the defendants' conduct was the proximate cause of the commencement or continuation of the original criminal proceedings, the court must examine whether the defendants played a significant role in the plaintiff's prosecution."). As such, he has plausibly alleged that Kozak caused his prosecution.

Nevertheless, Gay has not plausibly alleged that Kozak acted with malice. In order to successfully plead a malicious prosecution claim, he must plausibly allege conduct from which malice can be inferred, "such as a lack of good faith, a failure to adequately investigate, or personal animosity." *Evans v. Matson*, No. 23-2954, 2024 WL 2206638, at *3 (7th Cir. May 16, 2024); *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014) ("Malice may be shown by evidence of personal animosity of inferred from a complete lack of probable cause or a failure to

conduct an adequate investigation under the circumstances." (quotation marks omitted)). To the extent Gay alleges the Officers failed to adequately investigate, it is not indicative of malice. Although the Court certainly has questions about why it took over nine months to locate The Gathering's liquor license, that does not rise to a level sufficient to infer malice. The relevant alleged failure to investigate in this case, the Officers' failure to confirm whether The Gathering had a liquor license, is far less significant than other alleged failures to investigate which the Seventh Circuit has found harmless. *Cf. Holland v. City of Chicago*, 643 F.3d 248, 251–52, 254–55 (7th Cir. 2011) (noting that, "[a]lthough the police should have done a better job of investigating" another suspect, who they were told lived at the same residence of the suspect and was the registered owner of the abandoned car in which the crime occurred, their failure did not violate the plaintiff's constitutional rights). And, as the Court determined that Kozak's investigation plausibly led to his causing Gay's prosecution, it would be inconsistent to conclude that he also maliciously prosecuted Gay by failing to investigate that same information.

Moreover, the amended complaint does contain allegations which could sound in personal animosity, *see, e.g.*, Am. Compl. ¶¶ 39, 66, 77, 82, but the only allegation of Kozak's involvement in this conduct is one question of whether Gay was related to Nekai and reference to a prior shooting with which Nekai was involved, *id.* ¶ 82. This sole allegation vaguely sounding in personal animosity certainly does not rise to the level such that malice can be inferred. *Compare Jones v. Parkview Health Sys. Inc.*, No. 1:25-CV-461-HAB-ALT, 2026 WL 2620247, at *3, 13 (finding that the plaintiff has not alleged "targeted animosity" sufficient to infer malice when she alleged that the defendant filed a fabricated medical theft complaint and changed its story to implicate her as committing a crime), *with Owens v. Downey*, 150 F. Supp. 3d 1008, 1014–15, 1027–28 (S.D. Ind. 2015) (finding that the plaintiff pled malicious prosecution by

plausibly alleging a detailed history of animosity between the plaintiff and defendants, spanning years, with repeated threats of arrest).

In conclusion, Gay's malicious prosecution claims against Lonergan, Lawler, Bradley, and Danhof are dismissed for failure to plausibly allege causation, and his claim against Kozak is dismissed for failure to plausibly allege malice.

**3. Count IV: Failure to Intervene**

Defendants also argue that the absence of any underlying constitutional violations means that Gay's failure to intervene claim "fails a matter of law." Mot. Dismiss 20. Gay seems to agree, *see* Resp. 9–10 (challenging Defendants' motion "[b]ecause [he] plausibly pleads underlying Fourth Amendment violations"), and so does the Court. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (collecting cases across circuits); *see also Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Thus, when the constitutional rights of citizens are not being infringed upon, there is no affirmative duty to intervene. Because there are no remaining alleged constitutional violations, Gay's failure to intervene claim is dismissed.

**ii. Potential State Tort Claims Against the Officers**

Gay clearly enumerates three counts against the Officers; however, "it is factual allegations, not legal theories, that must be pleaded in a complaint," *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014), and the Court has a duty to construe *pro se* complaints liberally, *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). As such, the Court will briefly address potential state torts discussed by Defendants' motion to dismiss—negligence,

false arrest, false imprisonment, and malicious prosecution.[9] Mot. Dismiss 20–21. "[I]t is the well-established law of [the Seventh Circuit] that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also* 28 U.S.C. § 1367(c)(3). However, in some cases, a "federal decision of the state-law claims on the merits" is appropriate. *Wright v. Associated Ins.*, 29 F.3d 1244, 1251 (7th Cir. 1994). "[A] district court should consider and weigh the factors of judicial economy, convenience, fairness and comity . . . ." *Id.* If a district court retains jurisdiction over state supplemental claims, it should state its reasons for doing so. *Groce*, 193 F.3d at 501.

The Court declines to retain jurisdiction over these potential claims. While judicial economy favors the exercise of supplemental jurisdiction in this case, fairness heavily weighs in favor of declining supplemental jurisdiction. The case at hand is in its very early stages, Gay is proceeding *pro se*, and he has not even articulated these state law claims within his complaint. Without adequate briefing on the merits and without a clear understanding of what legal theories might be at issue, ruling on the state law claims, in this case, would be unfair. As such, the Court dismisses any state law claims of false arrest, false imprisonment, malicious prosecution, and negligence without prejudice.

**b. Claims Against the City**

Gay also brings two claims against the City: *Monell* liability under § 1983 (Count III), Am. Compl. 22–24, and indemnification under 745 ILCS 10/9-102 (Count V), *id.* at 25. Under § 1983, the City can only be held liable for the Officers' conduct "if the unconstitutional act

[9] Defendants also argue for dismissal of "evidence-handling" and Freedom of Information Act ("FOIA") allegations brought in Gay's complaint. Mot. Dismiss 11–13. Gay explicitly disclaims seeking recovery under any such legal theories, Resp. 7–8 (stating he included information about evidence handling and FOIA "as factual support" for his enumerated counts), and so the Court does not address them.

complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Because Gay has not plausibly alleged any unconstitutional acts, *see supra* Section II(a)(i), his *Monell* liability claim must be dismissed. Additionally, because all of Gay's other claims have been dismissed, the City is also entitled to dismissal of Gay's indemnification claim without prejudice. *See* 745 ILCS 10/9-102 (outlining the instances in which "[a] local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages").

**CONCLUSION**

Accordingly, Defendants City of Rock Island and Officers Adam Bradley, Brieanne Lonergan, Andrew Lawler, Thomas Danhof, and Brian Kozak's first motion to dismiss, ECF No. 7, is MOOT because Plaintiff Nico Gay filed an amended complaint. Defendants' motion to dismiss the amended complaint, ECF No. 20, is GRANTED. Gay may file a second amended complaint by October 30, 2026, if he can in good faith cure the deficiencies identified.

Entered this 30th day of September, 2026.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE