E-FILED
Friday, 30 October, 2026 09:09:14 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF ILLINOIS**

**ROCK ISLAND DIVISION**

FILED
OCT 30 2026
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

NICO D. GAY, Plaintiff,

v.

CITY OF ROCK ISLAND; ADAM BRADLEY; BRIEANNE LONERGAN; ANDREW LAWLER; THOMAS DANHOF; and BRIAN KOZAK, Defendants.

Case No. 4:25-cv-04193-SLD-RLH

# SECOND AMENDED COMPLAINT

42 U.S.C. § 1983 and Related State-Law Relief

## NATURE OF THE ACTION

1. Plaintiff Nico Gay, proceeding pro se, brings this action under 42 U.S.C. § 1983 for unreasonable seizure, arrest, and continued detention following the October 29, 2023 shooting in Arts Alley, Rock Island, Illinois, and for the ensuing criminal proceedings under 430 ILCS 66/65(a)(9). Plaintiff also pleads municipal liability, failure to intervene, and statutory indemnification.

2. The criminal charge alleged that The Gathering derived more than fifty percent of its gross receipts during the preceding three months from alcohol sales. Plaintiff alleges that the officers lacked objectively reasonable grounds for that statutory inference in light of the establishment's earlier unlicensed event-hall operations, its September 25, 2023 liquor-license transition, the first public licensed opening, and the particular information available to each officer. Plaintiff disputes probable cause without suggesting that a financial audit or proof beyond a reasonable doubt was required. (Exs. A7, B1–B5, D1–D4, E2.)

**JURISDICTION, VENUE, AND PARTIES**

3. This action arises under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), and supplemental jurisdiction over the related state-law claim under 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b)(2) because the material events occurred in Rock Island County, Illinois.

4. Defendant City of Rock Island is an Illinois municipal corporation operating the Rock Island Police Department ("RIPD"). During the events alleged, Defendants Adam Bradley (sergeant), Brieanne Lonergan, Andrew Lawler, and Thomas Danhof (patrol officers), and Brian Kozak (detective) were City employees acting under color of state law. The officers are sued in their individual capacities; the City is sued in Counts III and V.

5. Plaintiff is an Illinois resident who possessed a valid Illinois Firearm Owner's Identification ("FOID") card and active Illinois Concealed Carry License ("CCL") on October 29, 2023. (Exs. A5, C2.)

**FACTUAL ALLEGATIONS — A. The Gathering and Prior Department Knowledge**

6. The Gathering is an establishment located at 1718 Second Avenue in downtown Rock Island, Illinois. At all times relevant to the events described herein, the establishment was owned and operated by Kenneth Allen.

7. For approximately sixteen to seventeen months before October 29, 2023, Allen operated The Gathering as an event hall and entertainment venue without a liquor license. At the November 7, 2023 sworn hearing, Allen expressly described the establishment's operations before licensure as "Event hall. Birthday parties, graduations, that type of stuff," testified that the business had operated for about "a year and four months, year and five months," and

answered "No" when asked whether alcoholic beverages had been served before licensure. (Ex. D4.)

8. RIPD investigated the April 23, 2023 shooting near The Gathering (RI23-01893). Its CAD records identify Bradley (unit 3120) and Lonergan (unit 3303) as responding officers. Bradley personally investigated, reviewed City surveillance, and prepared a supplemental report. (Exs. B1–B4.)

9. Plaintiff alleges on information and belief that Bradley and Lonergan were familiar with The Gathering's operation as an event venue before it obtained a liquor license. Bradley and Lonergan responded to the April 23 shooting; Bradley investigated and reviewed surveillance of the premises. Lonergan's later statement that The Gathering had a liquor license 'now' supports an inference that she knew the license was newly obtained. These facts support familiarity with the transition, but do not independently establish that either officer knew the venue's exact receipts or first-public-opening date. (Exs. A7, B1–B5, D4.)

10. The April 24 nuisance notice linked that earlier shooting to The Gathering. Lieutenant Morris later testified the establishment had no liquor license in April, had operated "as a private business," and had previously been denied a license. Morris personally contacted Allen about preparations for licensed operations before October 29. These facts document RIPD's prior licensing and nuisance-enforcement involvement. (Exs. B5, D4.)

11. The City issued The Gathering an ordinary liquor license on September 25, 2023, effective through April 30, 2024. Morris contacted Allen about preparations roughly two weeks before the October event. Allen later described the October 28–29 Halloween event as "the first opening night to the public," essentially a grand opening of licensed alcohol service.

The prior three-month period therefore included earlier event-hall operations, though the licensing date alone does not establish the numerical receipts percentage. (Exs. D4, E2.)

12. The three-month statutory lookback encompassed prior event-hall operations, but the identified records do not establish the amounts or composition of the establishment's gross receipts. The recent license alone establishes no specific receipts percentage. (Exs. D4, E2.)

**FACTUAL ALLEGATIONS — B. October 29 Shooting, Video, Investigation, and Custody**

13. On October 29, 2023, at approximately 2:02–2:03 a.m., gunshots were fired in Arts Alley in downtown Rock Island, Illinois, across Second Avenue from The Gathering, located at 1718 Second Avenue. (See Exhibits A19–A23, C1, C5, and C6.)

14. At approximately 2:04:55–2:05:21 a.m., two people near a Chinese food stand, including Jorge L. Marceleno-Lopez, told Lawler that a man wearing a yellow jacket had displayed a firearm and entered The Gathering. One said, "When he heard gunshots, he pulled his gun out." When Lawler asked "Who was shooting?" Lopez answered, "We have no clue," and described individuals in a white hoodie and a yellow hoodie associated with the gunfire. The witnesses did not identify themselves as The Gathering employees or report denying armed entry. (Exs. A2, C1.)

15. Plaintiff wore a navy-blue, yellow, and white leather jacket with yellow sleeves, but no hood. Plaintiff alleges that a description of an armed man reacting to gunfire should not be conflated with the distinct hooded-suspect descriptions; some yellow coloring was common to both descriptions.

16. The witnesses did not identify Plaintiff as firing. Their reports prompted investigation, but distinguished an armed person reacting to gunshots from hooded individuals associated with the shooting. Mere firearm possession did not show discharge. (Exs. A2, C1.)

17. At approximately 2:06:44 a.m., Lonergan attempted to open The Gathering's entrance doors but found them locked. Lonergan stated, "They can't lock the door." Lawler responded, "Apparently, they can." Lonergan then stated, "No, they can't. They have a liquor license now."

18. At approximately 2:07:04 a.m., Lawler inspected The Gathering's entrance. The visible signs advertised "THE GATHERING — EVENTS COMING SOON!" and other events; no standardized no-firearms sign appears in the entrance footage. Plaintiff alleges he saw no such sign on entering and received no warning from Allen or staff that licensed firearm carry was prohibited. Plaintiff knew the premises as an event hall and had no notice of facts establishing that alcohol accounted for over half its prior-three-month receipts. (Ex. A7.)

19. At approximately 2:07:10 a.m., Kenneth Allen, the owner of The Gathering, unlocked and opened the doors. Lawler asked, "Is there anybody in here with a yellow coat on?" Allen responded, "No." Lonergan then stated, "We gotta walk through, you guys have a liquor license, you can't deny us access."

20. At approximately 2:08:24 a.m., Plaintiff was walking toward the rear exit in the back room of The Gathering when Lawler physically stopped him. Lawler stated, "Let me see your hands, man." Plaintiff complied, displayed his hands, and asked what was happening. Lawler stated, "Let me pat you down, real quick." During the encounter, a civilian eyewitness stated, "This ain't the dude you looking for." Plaintiff also informed the officers that they had the wrong person. Lawler responded, "I know. Hey, just chill."

21. At approximately 2:08:44 a.m., while Plaintiff was being detained elsewhere, Bradley personally began reviewing Adrian I. Sanchez-Poata's approximately 35-second cellphone video. Its opening approximately 2.61-second frame depicts the interior of The Gathering—

not El Toro Loco—before the camera turns toward gunfire in Arts Alley across Second Avenue. Bradley obtained a still image of Plaintiff at a separate location. Lawler and Lonergan later saw the still; the reviewed footage does not establish that either saw the entire video before arrest. (Exs. A3, A9, A19–A27.)

22. At approximately 2:08:49 a.m., Lawler placed Plaintiff in handcuffs. Multiple people present within The Gathering stated that the officers had detained the wrong individual. Plaintiff was physically restrained and was not free to leave.

23. At approximately 2:09:46 a.m., Lawler radioed to Bradley, "We have him out back, boss." Allen then told Lawler, "He's supposed to be here," while pointing at Plaintiff.

24. The video records shooting sounds and civilians fleeing from Arts Alley across Second Avenue. At approximately 6.83 seconds, the final recorded gunshot is accompanied by a visible flash in Arts Alley. At approximately 13.06 seconds, Plaintiff is visible crouched behind a parked car across Second Avenue after the shooting, with bystanders nearby. At approximately 15.49 seconds, his handgun is pointed downward and his index finger is outside the trigger guard. The video does not visibly show Plaintiff firing. These are observations from the recording, not proof of everything occurring outside its field of view. (Exs. A19–A25.)

25. Bradley's circulated still depicted Plaintiff with a firearm but did not convey the full video's sequence or depict Plaintiff discharging his weapon. (Exs. A3, A24–A25.)

26. At approximately 2:10:10 a.m., Plaintiff asked Lawler to check the rounds in his firearm. Lawler responded, "No one's saying that you shot it but somebody saw you with it. Okay?" Lawler's statement distinguished the reported possession of a firearm from an accusation that Plaintiff actually discharged it.

27. Ronk reviewed Sanchez-Poata's video. His October 29 report states that Sanchez-Poata did not observe "the subject holding a pistol on his video fire the pistol when he was able to observe him." Ronk uploaded the video through Evidence.com, documenting information personally available to him. (Ex. C4.)

28. At approximately 2:11:06 a.m., dispatch advised Lonergan that Plaintiff held an active FOID card. (Exs. A5, C1–C2.)

29. At approximately 2:11:10 a.m., Lonergan separately asked, "How about a concealed carry?" RICOMM responded, "Affirmative," confirming Plaintiff's active CCL. These credentials supported lawful firearm possession generally but did not alone resolve The Gathering's status under §65(a)(9). (Exs. A5, C1–C2.)

30. At approximately 2:11:23 a.m., Bradley showed Danhof the still photograph from the civilian video and stated, "Here's the suspect." Danhof viewed it and discussed Plaintiff's hair. The image identified Plaintiff as the armed person near the car; it did not show a discharge. (Ex. A6.)

31. At approximately 2:12:06 a.m., several people informed Bradley and Danhof, 'We closed.' Allen stated, 'We kicked everybody out before two.' Lawler and Lonergan had already encountered the locked entrance before Plaintiff's initial seizure. Allen's express closing statement was made after that seizure but before Plaintiff's approximately 2:13:31 a.m. cruiser confinement. Plaintiff relies on closure as part of the information available at each stage, not as an automatic exemption from §65(a)(9). (Exs. A7, C1–C3.)

32. During the same encounter, Allen stated, "They grabbed my little cousin." Bradley asked who had detained Allen's cousin. Allen responded, in substance, that officers had taken his cousin behind the establishment and that his cousin possessed a license to carry and had not

been involved in the shooting. Allen stated, "Now he has a license to carry but he wasn't involved in nothing." Danhof asked Allen to identify his cousin. Allen responded, "Nico."

33. At approximately 2:13:31 a.m., Lawler secured Plaintiff's firearm and Plaintiff was placed, still handcuffed, in a police vehicle; the restraint continued while officers further investigated. (Exs. C1–C2.)

34. At approximately 2:14:56 a.m., Sanchez-Poata told Ronk, "It's like their first day open…," referring to The Gathering. Ronk personally received this information before Lawler's announced arrest. The reviewed BWC does not establish that he conveyed it to Lawler during their later conversation. (Exs. A10, C4; Ronk BWC at approximately 2:14:56 a.m.)

35. At approximately 2:16:48 a.m., during the telephone conversation with Bradley, Lawler described the source and substance of the information that initially led him to investigate Plaintiff, stating, "Well the people at the Chinese stand flagged me down and just said they saw him with a gun, but…"

36. At approximately 2:19:15 a.m., the same individual associated with Icons Martini who had initially approached Lawler approached Lonergan and discussed the shooting and the establishment's surveillance camera facing Arts Alley. The individual described hearing numerous shots and spoke concerning his own observations of the incident. Lonergan asked, "Did you see the suspect?" The individual responded, "Nah, he had a white coat on." Lonergan repeated, "White coat." The individual affirmed the clothing description. (See Exhibit A8.)

37. Lonergan heard the Icons representative's 'white coat' description with Bradley nearby. It differed from descriptions of hooded shooters and Plaintiff's non-hooded jacket. (Ex. A8.)

38. At approximately 2:22:25 a.m., Lawler viewed the photograph sent by Bradley. The photograph depicted Plaintiff crouched behind a parked vehicle on Second Avenue, across from Arts Alley, with his firearm pointed downward. Lawler stated, "Yeah, that's him." Lawler then showed the photograph to Lonergan, who responded, "Oh, yeah." (See Exhibit A9.)

39. Lawler and Lonergan recognized Plaintiff in Bradley's still depicting firearm possession, not discharge; neither is shown viewing the complete video before arrest. (Ex. A9.)

40. At approximately 2:22:50 a.m., Allen told Danhof, separately from Lawler and Lonergan, 'I've been fighting Rock Island for four years to get my liquor license and I just got it, okay?' Danhof answered, 'Yeah, and I don't wanna see that messed up, that's why I told you in there that it could potentially affect your liquor license.' Plaintiff alleges Danhof's response supports an inference of earlier familiarity with the licensing dispute or recent change, without establishing he knew the receipts figures. The available BWC does not show him relaying Allen's 'just got it' statement to Lawler or Lonergan before the 2:24:37 a.m. arrest announcement. (Exs. A12, C3.)

41. During the same encounter, Lawler and Lonergan asked Plaintiff whether he wanted to speak with a detective. Plaintiff responded, "No. I just want to talk to my lawyer. I don't want to talk to no detective." While speaking with Bradley by telephone, Lawler relayed Plaintiff's refusal to speak with a detective and identified Plaintiff by name. This exchange occurred before Lawler expressly announced Plaintiff's arrest at approximately 2:24:37 a.m.

42. At approximately 2:24:21 a.m., Ronk approached Lawler. Ronk stated, "Got all the video. Got some suspect photos uploaded already." Lawler responded, "He's right here." Ronk

asked for clarification. Lawler stated, “I already saw it.” Ronk acknowledged the response. (See Exhibit A10.)

43. At approximately 2:24:37 a.m., while Plaintiff's sister, Tyonna, questioned whether Plaintiff was the person suspected in the shooting, Lawler expressly announced, 'He's under arrest.' The timing identifies when Lawler announced the decision; Plaintiff does not rely on the sister's question, by itself, as proof of discriminatory motive.

44. At Lawler's approximately 2:24:37 a.m. arrest announcement, Plaintiff had been detained for roughly sixteen minutes and handcuffed for fifteen. He remained in police custody. Plaintiff identifies this express arrest decision and the ensuing detention as the challenged arrest, with the preceding investigative steps alleged as relevant context.

45. At approximately 2:25 a.m., Lawler told Lonergan to wait outside Post 2 pending charges. At approximately 2:27:58 a.m., Plaintiff, still handcuffed in her squad vehicle, asked why he was arrested despite his CCL. Lonergan explained, “Some witnesses put you with a gun on scene, so that’s why you were being detained and arrested”; “Cuz you’re on camera with the gun”; and “Well because we have you at the scene of a shooting with a gun on video.” She identified no discharge or prohibited-premises classification in that explanation. At approximately 2:31:14 a.m., Lonergan asked Bradley, “What am I charging him with or doing with him?” and acknowledged standby instructions. (Exs. C1–C2; Lonergan BWC at 2:27:58 a.m.)

46. At approximately 2:31:30–2:33:02 a.m., Danhof interviewed Jorge L. Marceleno-Lopez in Arts Alley about persons wearing yellow and white hoodies. Lopez was uncertain which one fired. Asked whether he saw the suspected shooter’s face clearly enough to identify him,

Lopez replied, "No," explaining he was working and had been told to get down for safety. (Exs. A12, C3.)

47. At approximately 2:34:55–2:35:02 a.m., Danhof reported Lopez's account of a yellow-hooded shooter in Arts Alley near a white-hooded person. After Lawler described Plaintiff's yellow, black, and white jacket, Danhof answered, "Yeah, he said it was that one," and confirmed it was "the same guy." This apparent identification was potentially inculpatory, but Lopez had told Danhof he could not identify the shooter's face, and Plaintiff wore a non-hooded jacket. Plaintiff alleges the difference between Lopez's original statement and Danhof's relay materially qualified probable cause. (Exs. A12, C1, C3.)

48. At approximately 2:35:49 a.m., Danhof's BWC shows Bradley beside Danhof during a phone call with Lonergan, immediately after Danhof relayed Lopez's Arts Alley account. Bradley stated, "If he says no, I'll just have him be charged with aggravated," referring to another detective interview. Lonergan again asked Plaintiff to speak; he declined and requested counsel. She relayed, "He says no," and Bradley instructed aggravated-discharge processing. The still establishes timing; the BWC audio supports Bradley's words. (Exs. A12, A14, C2–C3.)

49. Bradley's conditional direction, made after Danhof's briefing, is alleged as evidence bearing on the shooting charge and ensuing custody, not as a claim that merely seeking an interview violated the Constitution. (Exs. A14, C2–C3.)

50. At approximately 2:42:48 a.m., Plaintiff was taken into the facility for processing in connection with the aggravated-discharge investigation. (See Exhibit A16.)

51. At approximately 2:53:59 a.m., Lawler stated words to the effect, "We'll suspend their liquor license, and we'll drop the charge against him." Lonergan responded, "Their first fucking

weekend." Lawler replied, "No shit." This after-arrest exchange supports awareness of the recent opening by then; with Lonergan's earlier "liquor license now" statement, it supports an inference of familiarity with the licensing transition without establishing when Lawler first learned of the opening.

52. At approximately 4:24:39 a.m., Kozak introduced himself and stated, "I looked over the video. I know some things that the officers didn't know on scene." Kozak explained that he wished to discuss the incident and proceeded to advise Plaintiff of his Miranda rights.

53. Kozak replied, "so here's the deal. What your charged with.. with… what they brought you in for… is aggravated discharge with a firearm. What's your gonna leave here… is your gonna be charged with 430 ilcs 66/65. Okay?"

54. Kozak continued: "Okay. However, because you have a carry and concealed license doesn't mean you can take your gun wherever. You can't take it inside the presidents… inside the White House, you know?… inside of certain places. One of those places is a bar where they sell alcohol, which is what The Gathering is, Right? That bar downtown. You went inside that bar and you had your gun. You're not supposed to do that and that's why you're getting this court date to go to."

55. During the approximately 4:24–4:39 a.m. interview, Kozak stated that he had reviewed additional video and told Plaintiff the aggravated-discharge accusation would be replaced with a charge under 430 ILCS 66/65. He characterized The Gathering as a bar serving alcohol but identified no financial records substantiating the statute's separate preceding-three-month receipts requirement. The record does not establish that video alone caused the charge substitution. (Exs. A18, C6.)

56. At approximately 4:32:04 a.m., Kozak stated, "I know you have nothing to do with the shooting outside."

57. At approximately 4:34:55 a.m., Kozak asked whether Plaintiff was related to Nekai Gay, referencing an unrelated earlier shooting. At approximately 4:36:15 a.m., Kozak acknowledged having spoken with Plaintiff's mother "a lot about Nekai." Plaintiff alleges this showed preexisting family familiarity relevant to his later investigative and charging decisions. (Exs. A18, C6.)

58. Plaintiff was released on a Notice to Appear identifying 430 ILCS 66/65(a)(11). The Notice to Appear identified a statutory provision concerning specified special-event retailer's or special-use alcohol-licensing circumstances. (Ex. H.)

**FACTUAL ALLEGATIONS — C. Administrative Hearing and Department Records**

59. At the November 7 hearing, Allen reiterated that the October 28–29 event was the first public opening. Danhof testified that Lopez could not identify the two armed hooded individuals by their faces. Lawler's and Danhof's testimony and the investigative accounts placed the reported gunfire in Arts Alley, across Second Avenue from The Gathering. This sworn testimony corroborates the officers' investigation and later knowledge, but is not automatically attributed to every officer at the earlier arrest. (Ex. D4.)

60. Lawler testified that he heard the shots in Arts Alley and, when specifically questioned, agreed the shooting was in Arts Alley, outside The Gathering. (Hearing Tr. 43, 49; Ex. D4.)

61. Kozak testified, "when that flash of gunfire takes place, that same individual wearing that same yellow hooded sweatshirt is right around the area of the flash. Him and there's two other subjects as well." (Hearing Tr. 57–58; Exhibit D4.)

62. When asked what offense Plaintiff had been cited for, Kozak stated, "Nico had a valid carry concealed and a FOID card as well. And he was cited for prohibited places, for bringing that firearm into the tavern." (Hearing Tr. 61; Exhibit D4.)

63. On October 31, Chief Richard Landi directed Deputy Chief Timothy McCloud to identify the October 30 nuisance notice as the second involving the property; the notice itself acknowledged the October event as the tavern's first public opening. Lieutenant Morris's November 1 memorandum, addressed to Mayor Michael Thoms, was approved and signed by Landi. These later documents are evidence of departmental and supervisory treatment of the business; they did not retroactively cause the October 29 arrest. (Exs. D1–D3.)

64. Morris's November 1 memorandum, approved by Chief Landi, referred to carrying in an alcohol-serving establishment but expressly quoted the more-than-50% preceding-three-month receipts condition. Morris also recounted Allen's acknowledgment that Plaintiff had a carry license and was armed inside. Mayor Thoms's later order characterized Allen as having allowed Plaintiff access to and from the venue while armed. These later official characterizations bear on the City's interpretation and Allen's conduct; they do not establish that Allen expressly authorized armed entry or that the arresting officers knew the order's findings beforehand. (Exs. D3–D5.)

**FACTUAL ALLEGATIONS — D. Criminal Charge, Dismissal, and Refiling**

65. Kozak's November 8 report documents that ASA Cichon drafted the original §65(a)(9) charge on November 6, 2023 and that Kozak presented it for judicial processing. The Information in Case No. 2023CM355 expressly alleged that The Gathering derived "more than 50% of the establishment's gross receipts within the prior 3 months from the sale of alcohol." Kozak personally signed a notarized affidavit affirming the truth of the

Information's allegations. The oath establishes his personal adoption of the allegation, not by itself that he knowingly swore falsely. (Exs. C8, G1.)

66. Following dismissal with leave on July 16, 2024, ASA Williams informed Kozak that the State had been unable to determine whether The Gathering collected sufficient alcohol revenue. City Clerk Samantha Gange told Kozak that the ordinary liquor license issued September 25, 2023 and that the business had been open only one day at the time of the shooting. Kozak's July 28 supplemental report documented those communications but did not identify gross-receipts records or other evidence substantiating the required percentage. (Exs. E1, E4.)

67. On July 31, 2024, the State refiled a prohibited-location charge as Case No. 2024CM307. Detective Brett Buchen's August 2 report states that ASA Williams supplied the renewed charge for service, Judge Derek Hancks signed it, and the case proceeded by Notice to Appear. (Exs. E5–E6.)

68. In February 2025 correspondence, ASA Grant Grimes discussed the supplemental reports and the absence of established alcohol receipts; at the May 6, 2025 hearing he stated, "There is a supplemental report that was added, and ASA Williams stepped in and refiled the matter." (Hearing Tr. 8:4–6; Exs. E6–E7.)

69. The record reflects July 16 dismissal with leave, Kozak's July 28 supplemental investigation, July 31 refiling, and the final June 3, 2025 dismissal without leave. Prosecutorial statements later connected the supplemental report with refiling. (Exs. E1, E4–E8.)

**FACTUAL ALLEGATIONS — E. Injuries**

70. Plaintiff alleges loss of liberty, emotional and psychological harm, humiliation, disruption to personal and professional activities, and economic losses from the allegedly unlawful detention and proceedings, to the extent attributable to actionable conduct. (Exs. E1–E8.)

71. A January 26, 2026 letter from Alexander Hogg, LCSW, of Southpark Psychology, Ltd. documents psychological difficulties associated with the incident. Plaintiff seeks only damages supported by evidence and applicable law.

**COUNT I — Fourth Amendment: Unreasonable Seizure, False Arrest, and Continued Detention**

**(Against Lawler, Lonergan, Bradley, and Danhof)**

72. Plaintiff incorporates the preceding factual allegations as relevant to each Defendant's knowledge and conduct.

73. Plaintiff challenges Lawler's expressly announced arrest at approximately 2:24:37 a.m. and Plaintiff's ensuing detention. Plaintiff alleges that the facts objectively known or communicated to the responsible officers at that time did not establish probable cause for aggravated discharge or an offense involving a qualifying prohibited location.

74. Plaintiff distinguishes the officers' initial investigation of reported gunfire and an armed person from their later decision to arrest and continue holding him after the license checks, witness accounts, and available video information. (Exs. A2–A5, C1–C2.)

75. Section 65(a) prohibits "knowingly" carrying a firearm into enumerated prohibited premises. Under §65(a)(9), an alcohol-serving establishment qualifies only if more than fifty percent of its preceding-three-month gross receipts came from alcohol sales. Plaintiff alleges on information and belief that The Gathering did not satisfy that condition on October 29, 2023.

Plaintiff separately alleges that the officers lacked objectively reasonable grounds to infer otherwise from its ordinary liquor license or witness descriptions as a "bar." (Exs. D4, E2.)

76. At approximately 2:06:44 a.m., before Plaintiff's seizure, Lonergan stated to Lawler, "No, they can't. They have a liquor license now." Plaintiff alleges her April involvement and use of "now" support an inference of knowledge of the licensing transition. She directly communicated that change in status to Lawler before he seized Plaintiff. (Exs. A7, B1, C1–C2.)

77. At approximately 2:16:37 a.m., Lonergan asked Lawler, 'You also can't have a gun in a bar, right?' Plaintiff alleges this reflected reliance on the bar designation rather than the separate statutory receipts condition.

78. In People v. Lyke, 2021 IL App (1st) 170371-U, ¶¶ 32–38, Mathis was a nightclub bouncer responsible for entry rules who personally denied an armed individual admission, reported that attempted entry, and identified the individual to police. Here, Lawler's sources were civilians near a Chinese food stand who described a man drawing his firearm after hearing shots and entering The Gathering. Neither claimed to enforce entry rules, deny armed entry, or know the venue's alcohol-receipts classification. Allen instead told Lawler, 'He's supposed to be here,' and told Bradley and Danhof Plaintiff had a CCL and was uninvolved in the shooting. Plaintiff alleges that these materially different circumstances supported investigation but did not establish probable cause for arrest without an objectively reasonable basis to classify The Gathering under §65(a)(9). (Exs. A2, C1–C3, D4.)

79. At approximately 2:22:50 a.m., Allen personally told Danhof he had obtained a liquor license only recently, after years seeking City approval. Danhof received that information before

Lawler's approximately 2:24:37 a.m. arrest announcement and remained involved in the coordinated investigation and later discussions concerning Plaintiff's custody. (Ex. C3.)

80. The suspected shooting and prohibited-premises violations were distinct. Evidence that Plaintiff possessed a gun did not itself show a discharge or establish that The Gathering satisfied the statutory receipts condition. (Exs. A2, A19–A25, C1, C4.)

81. The initial Notice to Appear cited §65(a)(11), applicable to specified special-event retailer's or special-use permit licenses. Gange provided an ordinary City Class E liquor license; the cited records identify no qualifying special license. Kozak's November 8 report records his November 2 consultation with ASA Cichon and Cichon's November 6 charge. The Information instead alleged §65(a)(9)'s distinct preceding-three-month receipts condition, which Kozak affirmed under oath. Plaintiff alleges that the charging sequence and officers' explanations bear on whether either classification had an objectively reasonable factual basis, not that the differing subsections prove knowing falsity. Plaintiff alleges that the sequence supports an inference that, after the aggravated-discharge accusation was abandoned, the prohibited-location charge was adopted as an alternative asserted basis for Plaintiff's remaining detention and the issuance of a Notice to Appear, notwithstanding the absence of identified facts establishing a special-event retailer's license or special-use permit license under §65(a)(11). (Exs. C8, E2, G1, H.)

82. By the 2:24:37 a.m. arrest announcement, Lawler knew the food-stand witnesses' descriptions, Lonergan's pre-seizure 'license now' statement, and Allen's 'supposed to be here' statement; he had encountered locked doors and reviewed Bradley's firearm-possession still. Lonergan had verified Plaintiff's FOID and CCL and heard the 'white coat' description. Bradley had viewed the civilian video and heard Allen's statements; Danhof had separately heard Allen's 'just got it' licensing account. Plaintiff attributes each fact to the officer who knew it or received it before the announcement, without imputing Danhof's unrelayed statement to Lawler. Plaintiff challenges the announced arrest and ensuing custody on that record.

83. As to Lawler, the relevant personal facts include the food-stand witnesses' differentiated suspect accounts, his seizure and handcuffing, Allen's 'supposed to be here' statement, Plaintiff's lawful-credentials statements, the photograph he later reviewed, and his own observation that no one was accusing Plaintiff of actually shooting. Lawler then announced arrest and remained involved in custody and charging discussions. (Exs. A2, A9, C1.)

84. As to Lonergan, the relevant personal facts include her statement that the venue had a liquor license "now," verification of Plaintiff's active FOID and CCL, the "white coat" description, review of Bradley's still photograph, custody and transportation, and her question about guns "in a bar." At Post 2, she explained the arrest by reference to witnesses and video depicting Plaintiff with a gun at the shooting scene, without identifying a discharge or a prohibited-premises classification. She communicated with Bradley while Plaintiff remained detained. Her first-weekend remark occurred after arrest. (Exs. A5, A8–A9, C2.)

85. As to Bradley, the relevant personal facts include his April investigative involvement, his full review of Sanchez-Poata's video, the still image he sent, Allen's statements about Plaintiff's CCL and noninvolvement, his conversations with Lawler, his briefing of Kozak, and the later aggravated-discharge charging direction. The claim against Bradley rests on his own causally significant directions and communications, not his title alone. (Exs. A3, A6, B1–B2, C6.)

86. Danhof saw Bradley's still, heard Allen describe Plaintiff as licensed and uninvolved, received Allen's recent-license account at 2:22:50 a.m., and relayed Lopez's Arts Alley account to Bradley and Lawler, including the subsequent "same guy" identification. He stood beside Bradley during the 2:35:49 a.m. call with Lonergan, making his knowledge and statements relevant to continued custody. (Exs. A6, A12, A14, C3.)

87. Plaintiff alleges that probable cause for aggravated discharge was absent by Lawler's approximately 2:24:37 a.m. arrest announcement and was not established during continued custody. The food-stand witnesses described a man drawing his gun upon hearing shots, while describing other white- and yellow-hooded persons associated with firing. Lawler stated that no one accused Plaintiff of shooting. Bradley viewed Sanchez-Poata's video, which showed Plaintiff taking cover after gunfire with his handgun pointed downward, not visibly firing; Lonergan heard a separate 'white coat' description. Later, Danhof interviewed Lopez, who could not identify the shooter's face, but relayed an apparently inculpatory 'same guy' identification; Bradley's 2:35:49 a.m. conditional statement preceded the later charging instruction. Plaintiff alleges these facts must be assessed according to when each officer learned them. The video does not depict everything outside its frame. (Exs. A2–A3, A8, A12, A14, A19–A25, C1–C4.)

88. Independently of aggravated-discharge suspicion, Plaintiff alleges that the information prompting the officers' investigation did not establish probable cause to arrest Plaintiff under §65(a)(9) at approximately 2:24:37 a.m. Witnesses called The Gathering a bar but supplied no receipts or entrance-restriction information. Lonergan told Lawler it had a license "now"; officers found locked doors and event signage; Allen told Lawler Plaintiff was "supposed to be here." Bradley and Lonergan had participated in the April investigation. Danhof separately heard Allen's "just got it" statement, and Ronk separately heard it was like the first day open, but neither is shown to have conveyed that information to Lawler before arrest. Allen later testified to earlier event-hall operations without alcohol service. Plaintiff alleges The Gathering did not meet the statutory receipts condition and that the facts actually known or communicated to arresting officers did not reasonably support a contrary

inference. Separately, Plaintiff alleges he knew the venue as an event hall, saw no posted firearm-prohibition notice, received no warning, and was unaware of facts suggesting the statutory condition was satisfied. No witness reported that Plaintiff was warned, denied entry, or knew of circumstances that would have made the premises a qualifying prohibited location. Plaintiff alleges the officers lacked facts supporting such knowledge independently of knowing firearm possession; he does not assert that he had to know the statute or review business accounts. The record also identifies no qualifying special license under §65(a)(11). (Exs. A7, A10, B1–B5, C1–C4, C8, D4, E2, G1, H.)

**COUNT II — Fourth Amendment: Malicious Prosecution**

**(Against Lawler, Lonergan, Bradley, Danhof, and Kozak)**

89. Plaintiff incorporates the preceding factual allegations relevant to prosecution under §65(a)(9).

90. Plaintiff alleges that the individual Defendants' conduct described below materially caused or contributed to criminal proceedings unsupported by probable cause and pursued with malice, ending in Plaintiff's favor.

91. The omitted licensing transition, prior event-hall operations, first public alcohol-serving opening, and Allen's statements were material to the specific §65(a)(9) charge and its preceding-three-month receipts condition.

92. Lawler's October 29 report described 'Violation of Conceal Carry - Prohibited Area (Tavern)' but omitted Lonergan's 'liquor license now' statement, Allen's 'supposed to be here' statement, and his later linkage of the charge to liquor-license enforcement. (Ex. C1.)

93. Lonergan's report documented verified firearms credentials and custody but omitted her earlier 'liquor license now' remark. Plaintiff alleges the omission obscured the information underlying her premises classification. (Ex. C2.)

94. Danhof's report omitted Allen's statement that the liquor license was recently obtained after years of seeking approval. Danhof personally heard the statement, but Plaintiff does not allege it reached Lawler or Lonergan before arrest. (Ex. C3.)

95. Bradley subsequently advised Lawler that Ronk had video of Plaintiff with a firearm and "possibly shooting too," notwithstanding that the footage Bradley reviewed did not visibly depict Plaintiff firing.

96. At approximately 2:45 a.m., Bradley personally briefed Detective Kozak concerning the shooting investigation before Kozak reviewed additional City-surveillance evidence and proceeded with the substituted firearm-possession charge. (See Exhibit C6.)

97. Kozak reviewed RIPD Case RI23-05346 materials and consulted ASA Cichon on November 2, 2023. Lawler's, Lonergan's, and Danhof's reports were in that investigative file; Bradley had also briefed Kozak directly. (Exs. C1–C3, C6, C8.)

98. Plaintiff alleges on information and belief that the officers' completed reports, which omitted the specific information identified above, supplied an incomplete premises history relevant to the November charge. The prosecutor's actual reliance on those omissions before charging remains unestablished. (Exs. C1–C3, G2.)

99. On December 5, 2023, ASA Sean M. Williams certified electronic disclosure of Evidence.com materials and RIPD Case RI23-05346 reports to defense counsel. This establishes prosecutorial access by that date, not what ASA Cichon reviewed before November 6. Plaintiff alleges on information and belief that the earlier reports, Bradley's

briefing, and Kozak's consultation and sworn participation influenced prosecution. (Exs. C1–C8, G1–G2.)

100. Bradley personally briefed Kozak and reported video of Plaintiff with a firearm and 'possibly shooting too,' although the video Bradley saw showed no visible discharge. Plaintiff alleges that the contents of the briefing affected Kozak's investigation. (Exs. C4, C6.)

101. Plaintiff alleges an improper-purpose inference from Lawler's statement linking withdrawal of Plaintiff's charge with suspending The Gathering's liquor license and from the April and October nuisance actions. (Exs. B5, D1–D2.)

102. Lonergan questioned Plaintiff about his relationship to Nekai during custody. Kozak later asked about Nekai and an unrelated shooting and said he had spoken with Plaintiff's mother 'a lot about Nekai.' Allen had also identified Plaintiff to Bradley and Danhof as his cousin. Plaintiff alleges on information and belief that this preexisting family familiarity, considered with the decision to pursue and later revive the receipts-based charge despite the documented evidentiary deficiency, supports an inference of improper purpose. The family questions alone are not alleged to establish malice. (Exs. A18, C2, C6–C8, D4, E4, G1.)

103. Kozak personally participated in the November 7 hearing, where Allen described prior event-hall operations, and had direct access to that testimony through his participation. In July 2024, Kozak requested liquor-license information from City Clerk Gange. Gange also certified the City's official November hearing record, but the certification is undated and does not show that she furnished the transcript to Kozak during their July exchange. Kozak's July report reported licensing information without citing the earlier hearing or identifying receipts proving the statutory percentage. (Exs. D4, D6, E2, E4.)

104. Plaintiff alleges that Kozak's July 28 report materially contributed to the July 31 refiling: it followed the dismissal over missing receipts evidence, addressed that deficiency without establishing the percentage, and was later referenced in prosecutorial explanations. Prosecutors retained charging discretion. (Exs. E4–E7.)

105. Plaintiff alleges on information and belief that Kozak acted without good faith or for an improper purpose based on his previous family familiarity, November 6 sworn receipts allegation, November 7 hearing participation, notice of the missing revenue proof, and July 28 report preceding refiling without documented receipts evidence. Plaintiff does not claim knowing falsity is already established. (Exs. A18, C6–C8, D4, E4–E7, G1.)

106. Lawler, Lonergan, Danhof, and Bradley allegedly contributed through personally attributable omissions in reports or communications, including Bradley's direct briefing to Kozak. Kozak had the more direct role through his affidavit, investigation, and July report. The December 5 disclosure does not establish which reports the prosecutor reviewed before November 6. (Exs. C1–C8, G1–G2.)

107. The July 16, 2024 dismissal with leave was followed by refiling. Plaintiff relies on the final June 3, 2025 dismissal without leave to reinstate as the favorable termination of the prosecution without conviction. (Exs. E1, E8.)

**COUNT III — Municipal Liability Under Monell**

**(Against the City of Rock Island)**

108. Plaintiff incorporates the material prior factual allegations for the specific municipal theories identified below.

109. Plaintiff alleges alternatively that the City maintained or tolerated a prohibited-premises enforcement practice or was deliberately indifferent to a foreseeable need to train or

supervise RIPD officers on §65(a)(9)'s receipts and knowledge requirements, firearm-prohibition signage, §65(a)(11)'s separate license categories, and reassessment of probable cause. Plaintiff alleges the City's own practice or omission caused the challenged arrest and ensuing detention, not that the City controlled prosecutorial decisions or was liable merely as an employer.

110. Plaintiff alleges on information and belief that officers could predictably encounter licensed firearm carriers at businesses serving alcohol, where treating an ordinary liquor license or colloquial "bar" designation as sufficient for prohibited-premises enforcement risks detention without an objectively supported statutory classification. Plaintiff alleges that the need to distinguish these categories and reassess custody as information developed was apparent from those recurring enforcement duties, independently of proof of unrelated earlier arrests.

111. In the October investigation, Lonergan asked whether carrying a gun "in a bar" was prohibited; Lawler's report labeled The Gathering a prohibited tavern; and Kozak described a bar serving alcohol as a prohibited place. The reports omitted or did not consistently discuss the recent licensing transition and earlier event-hall operations. Morris's later memorandum, approved by Chief Landi, used bar terminology but expressly quoted the 50% receipts condition. Plaintiff alleges that these differing accounts support an inference of a deficient application or supervision of the statutory distinction, not that every official was unaware of its text. (Exs. C1–C3, C6, D3.)

112. Plaintiff requested RIPD training materials on prohibited locations and the relevant statutory requirements on February 17, 2026. On February 23, Deputy Chief McCloud responded "1. No record" to that category. Plaintiff alleges this is circumstantial evidence

concerning the availability of responsive training records, not proof that no training of any kind occurred. (Ex. F1.)

113. The October 30 nuisance notice acknowledged The Gathering's first public licensed opening. The November 1 Morris memorandum, the November 7 administrative liquor-license hearing, and the mayor's later licensing order addressed the same premises. In parallel, the November 6, 2023 Information in Case No. 2023CM355 alleged §65(a)(9), and the State refiled that allegation in Case No. 2024CM307 in July 2024. These were two criminal cases and separate administrative proceedings arising from the same October incident—not three independent unconstitutional arrests. (Exs. D1–D5, E4–E5, G1.)

114. Senior municipal personnel participated in the subsequent licensing review: Morris prepared the memorandum approved by Chief Landi; Mayor Thoms issued the licensing order; and City Attorney Leslie Day's May 21, 2024 correspondence included Thoms, Deputy Chief McCloud, and Morris. Plaintiff alleges that this continuing institutional involvement and the repeated bar/tavern descriptions bear on whether a shared interpretation persisted. Those later acts did not themselves supply the officers' October 29 probable cause or retroactively cause the original seizure. (Exs. D3, D5, D7.)

115. Plaintiff alleges on information and belief that the City's deficient training, supervision, or settled interpretation predated October 29 and caused officers to treat an ordinary liquor license or "bar" description as sufficient without facts supporting §65(a)(9)'s receipts and knowledge requirements or §65(a)(11)'s specified license category, and to maintain custody without reassessment. Plaintiff alleges obvious need for training alternatively to widespread custom; later proceedings are circumstantial evidence of the alleged practice, not independent incidents proving a pattern. (Exs. A7, B1–B5, C1–C8, D1–D7, F1.)

**COUNT IV — Fourth Amendment: Failure to Intervene**

**(Against Lawler, Lonergan, Bradley, Danhof, and Kozak, as supported by individualized conduct)**

116. Plaintiff incorporates the relevant allegations and pleads failure to intervene in the alternative where a Defendant knew of another officer's unconstitutional conduct and had a realistic opportunity to prevent or end it.

117. Lonergan verified Plaintiff's FOID and CCL, heard differing shooter descriptions, and spoke with Lawler and Bradley during custody. She allegedly had an opportunity to convey those facts, question the prohibited-location premise, and seek release. This theory is alternative to her direct participation. (Exs. A5, A14, C2.)

118. Bradley reviewed the civilian video, heard Allen describe Plaintiff as licensed and uninvolved, and communicated with Lawler. He allegedly could have clarified the video's limits and reconsidered continued custody and the aggravated-discharge instruction following Danhof's briefing and Plaintiff's refusal of an interview. (Exs. A3, A6, A14, C2–C3.)

119. Danhof heard Allen describe Plaintiff as licensed and uninvolved, received the recent-license account, and interviewed Lopez, who could not identify the shooter's face. Having relayed the apparent 'same guy' identification, Danhof allegedly had an opportunity to qualify it with Lopez's uncertainty and the hoodie/jacket difference during continued custody. (Exs. A6, A12, A14, C3.)

120. Lawler personally seized, handcuffed, and announced Plaintiff's arrest. Alternatively, in subsequent custody and charging discussions he allegedly could have conveyed limitations of the witness identification and sought reassessment of detention by others.

121. Kozak joined after the initial seizure and released Plaintiff on a Notice to Appear after viewing additional evidence and substituting the prohibited-location charge. Plaintiff alleges only that, if unconstitutional confinement continued after he learned exculpatory facts, he had an opportunity to facilitate an earlier release. (Exs. A18, C6.)

**COUNT V — Illinois Statutory Indemnification, 745 ILCS 10/9-102**

**(Against the City of Rock Island)**

122. Plaintiff incorporates the allegations concerning the acts and employment of the individual defendants to the extent relevant to statutory indemnification.

123. Lawler, Lonergan, Bradley, Danhof, and Kozak performed the alleged investigation, detention, reporting, and charging as City employees. Plaintiff seeks indemnification under 745 ILCS 10/9-102 for any qualifying compensatory judgment against them.

124. Plaintiff seeks no City indemnification for punitive damages, which are sought only against responsible individual Defendants where legally permitted.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment on each claim proved and the following relief against the Defendants legally responsible for that claim:

**A.** Compensatory damages proved at trial for actionable deprivation of liberty, detention, emotional and psychological injuries, humiliation, documented economic losses, and other proximately caused harm, without duplicative recovery.

**B.** Nominal damages for any established constitutional violation without proved compensatory loss, and punitive damages only against an individual Defendant on the required showing. Plaintiff seeks no punitive damages against the City.

C. Judgment against the City only upon proof that its policy, custom, qualifying decision, or deliberately indifferent omission caused the constitutional violation; and indemnification under 745 ILCS 10/9-102 of any qualifying employee compensatory judgment.

D. Taxable costs and recoverable expenses; attorney's fees under 42 U.S.C. § 1988 if available (excluding Plaintiff's own pro se work); authorized prejudgment and postjudgment interest, including under 28 U.S.C. § 1961; and other just relief.

**JURY DEMAND**

Plaintiff demands a jury trial under the Seventh Amendment and Federal Rules of Civil Procedure 38 and 39 on all issues triable of right by jury. Issues reserved to the Court, including statutory indemnification, may be determined by the Court.

**SIGNATURE**

Respectfully submitted,

/s/ Nico D. Gay

Nico D. Gay, Plaintiff, pro se

Dated: October 29, 2026

Mailing address: 1841 13th Street, Moline, IL 61265

Telephone: (309) 350-9718 | Email: nico.gay.ng1@gmail.com

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF ILLINOIS**

**ROCK ISLAND DIVISION**

NICO D. GAY, Plaintiff,

v.

CITY OF ROCK ISLAND, et al., Defendants.

Case No. 4:25-cv-04193-SLD-RLH

## EXHIBIT INDEX — SECOND AMENDED COMPLAINT

### EXHIBIT A — October 29, 2023 Body-Worn-Camera Images, Scene Photographs, and Witness-Video Stills

**A1:** City-surveillance screenshot depicting Plaintiff's position across Second Avenue from Arts Alley during the October 29, 2023 shooting incident.

**A2:** Witness who provided information to Defendant Lawler, including pointing out the Arts Alley shooting location.

**A3:** Sergeant Bradley capturing a still image from the El Toro Loco owner's cellphone recording, depicting Plaintiff across Second Avenue from Arts Alley holding his firearm downward; no discharge by Plaintiff depicted.

**A4:** Sergeant Bradley directing Officer Ronk to interact with the El Toro Loco owner regarding the witness cellphone recording.

**A5:** Officer Lonergan viewing Plaintiff's Firearm Owner's Identification (FOID/CCL) card.

**A6:** Sergeant Bradley showing Officer Danhof the still photograph taken from the witness cellphone recording.

**A7:** Officers approaching and entering The Gathering: front entrance, "THE GATHERING — EVENTS COMING SOON!" signage and other posters; no standardized 430 ILCS 66/65(d) prohibited-firearm sign visible in the depicted entrance view.

**A8:** Icons Martini owner speaking with Officer Lonergan (Sergeant Bradley present), including description of a suspect wearing a "white coat," before Bradley's "good video for tonight" remark.

**A9:** Officer Lawler receiving Bradley's still photograph and showing it to Officer Lonergan.

**A10:** Officer Ronk approaching Lawler and Lonergan regarding uploaded video and suspect photographs shortly before Lawler announced the arrest.

**A11:** Officer Lawler assisting with placement of evidence markers near shell casings in Arts Alley.

**A12:** Witness speaking with Officer Danhof in Arts Alley, including uncertainty regarding the white-hoodie and yellow-hoodie individuals.

**A13:** Witness speaking with Officer Schneider about Plaintiff's location across the street during the shooting and the El Toro Loco owner's recording.

**A14:** Officer Thomas Danhof's October 29, 2023 body-worn-camera screenshot at approximately 2:35:49 a.m., depicting Sergeant Adam Bradley standing near Danhof and Lawler while speaking by telephone with Officer Brieanne Lonergan. The corresponding BWC audio records Bradley's conditional aggravated-discharge charging instruction concerning Plaintiff's willingness to speak with a detective.

**A15:** Officer Ronk speaking with Sergeant Bradley, Officer Lawler, Officer Danhof, and other officers during on-scene coordination.

**A16:** Plaintiff entering the jail area for processing and booking.

**A17:** Officer Lonergan meeting Officer Lawler near the jail after Plaintiff was taken inside.

**A18:** Detective Kozak advising Plaintiff that the aggravated-discharge allegation would be replaced with a charge under 430 ILCS 66/65.

**A19:** Cellphone-video screenshot at approximately 2.61 seconds, depicting the interior of The Gathering while Sanchez-Poata was recording, before turning his camera toward Arts Alley after the initial gunshots had begun.

**A20:** Cellphone-video screenshot at approximately 4.25 seconds, depicting Sanchez-Poata turning his camera toward Arts Alley while gunfire was ongoing, showing the area from which the gunshots were occurring.

**A21:** Cellphone-video screenshot at approximately 6.59 seconds, depicting civilians fleeing from the direction of Arts Alley as gunfire continued, illustrating the location of the shooting and the movement of individuals away from the gunfire.

**A22:** Cellphone-video screenshot at approximately 6.83 seconds, corresponding to the final recorded gunshot and depicting a visible gunfire flash on the left side of a pole as Sanchez-Poata moved past it. The flash appears within Arts Alley, across Second Avenue from The Gathering. This is the gunfire flash subsequently discussed by Detective Brian Kozak during the November 7, 2023 liquor-license hearing.

**A23:** Cellphone-video screenshot at approximately 7.31 seconds, depicting civilians continuing to flee from Arts Alley immediately after the final recorded gunshot. A civilian woman wearing a yellow dress is shown running toward Plaintiff's location across Second Avenue.

**A24:** Cellphone-video screenshot at approximately 13.06 seconds, depicting Plaintiff crouched behind a parked vehicle after the shooting had ceased, as Sanchez-Poata turned his camera toward Plaintiff. This view corresponds to the still-image evidence captured by Sergeant Bradley and Officer Ronk. Several civilians are visible standing near Plaintiff, including an individual standing upright with his hands in his pockets and a couple standing together. Sanchez-Poata recorded Plaintiff from the same side of Second Avenue at relatively close proximity.

**A25:** Cellphone-video screenshot at approximately 15.49 seconds, depicting Sanchez-Poata zooming in on Plaintiff's firearm while Plaintiff remained behind the parked vehicle. The image shows Plaintiff's finger positioned outside the trigger guard and his firearm pointed downward, without any visible discharge.

**A26:** Cellphone-video screenshot at approximately 21.32 seconds, depicting Plaintiff standing after the gunfire had ceased. The same civilian

woman wearing a yellow dress, previously shown fleeing from Arts Alley, is visible walking directly past Plaintiff, further documenting Plaintiff's location and the movement of civilians following the shooting.

**A27:** Cellphone-video screenshot depicting Sanchez-Poata turning away from the shooting scene and heading back toward El Toro Loco after the gunfire had ceased, documenting the concluding portion of the witness's recording.

**EXHIBIT B — Prior Business Operations and April 2023 Departmental Involvement**

**B1:** April 23, 2023 shooting response command/dispatch log identifying Sergeant Bradley and Officer Lonergan as responding personnel (Incident No. RI23-01893).

**B2:** Sergeant Adam Bradley — April 23, 2023 police report concerning the earlier shooting.

**B3:** Officer Hast — April 23, 2023 police report concerning the earlier shooting.

**B4:** Officer Costas — May 24, 2023 police report.

**B5:** April 24, 2023 Notice of Illegal Activity / nuisance-abatement letter concerning the earlier shooting at 1718 Second Avenue (Incident No. RI23-01893).

**EXHIBIT C — October-November 2023 Shooting Investigation, Arrest, and Charging Reports**

**C1:** Officer Andrew Lawler — October 29, 2023 supplemental police report concerning the on-scene investigation, Plaintiff's detention, and arrest.

**C2:** Officer Brieanne Lonergan — October 29, 2023 supplemental police report concerning Plaintiff's detention, verified firearm credentials, transportation, and charging account.

**C3:** Officer Thomas Danhof — October 29, 2023 supplemental police report concerning The Gathering owner's interview and the scene investigation.

**C4:** Officer Jeffrey Ronk — October 29, 2023 supplemental police report concerning witness cellphone footage and witness statements.

**C5:** Officer Gage Hawk — October 29, 2023 supplemental police report concerning shooting-scene evidence.

**C6:** Detective Brian Kozak — October 31, 2023 investigative report.

**C7:** Detective Brian Kozak — November 2, 2023 report.

**C8:** Detective Brian Kozak — November 8, 2023 report concerning criminal-charge proceedings.

**D7:** Attorney Leslie Day's email to Todd Thompson, Mayor Mike Thoms, Deputy Chief Timothy McCloud, and Lieutenant James Morris discussing the Illinois Liquor Control Commission order and its determination that revocation was an overly harsh penalty; correspondence sent before Detective Kozak's July 28, 2024 supplemental report.

**EXHIBIT E — Criminal Proceedings, Supplemental Investigation, and Refiling**

**E1:** July 16, 2024 order dismissing Plaintiff's first criminal prosecution with leave to reinstate.

**E2:** Samantha Gange-to-Detective Kozak email correspondence transmitting The Gathering's liquor license in July 2024.

**E3:** July 24, 2024 order directing the return of Plaintiff's firearm.

**E4:** Detective Brian Kozak — July 28, 2024 supplemental report concerning the dismissed criminal charge, subsequent liquor-license inquiry, and events preceding the refiling.

**E5:** Detective Buchen — August 2, 2024 report.

**E6:** Assistant State's Attorney Grimes and Assistant Public Defender McCabe — correspondence concerning the refiling and related grounds.

**E7:** May 6, 2025 criminal-court hearing transcript excerpt, including identifying cover page and original transcript pages 7–8, containing Assistant State's Attorney Grimes's acknowledgment concerning the supplemental investigative report and Assistant State's Attorney Williams's refiling of the criminal matter.

**E8:** June 3, 2025 order dismissing Plaintiff's second criminal prosecution without leave to reinstate.

**EXHIBIT F — Freedom of Information Act and Training-Record Evidence**

**F1:** Plaintiff's Freedom of Information Act request concerning Rock Island Police Department training and curriculum relating to 430 ILCS 66/65, together with the corresponding Department response reporting "1. No record" for the requested training item.

**EXHIBIT G — November 2023 Criminal Charging Documents and Prosecutorial Discovery Disclosure**

**G1:** November 6, 2023 original one-count criminal Information in People v. Nico D. Gay, Case No. 2023CM355, alleging a violation of 430 ILCS 66/65(a)(9), together with the accompanying affidavit signed and sworn by Detective Brian Kozak on November 6, 2023, attesting to the truth of the allegations contained in the Information.

**G2:** December 5, 2023 State's Attorney's Proof of Service, certified by Assistant State's Attorney Sean Williams, documenting electronic disclosure of Evidence.com materials, photographs, videos, reports, and RIPD Police Report RI23-05346 to Plaintiff's criminal-defense counsel.

## EXHIBIT H — Notice to Appear Issued Upon Release

**H:** October 29, 2023 Notice to Appear provided to Plaintiff upon release from custody, identifying 430 ILCS 66/65(a)(11) as the cited statutory subsection.

## END OF EXHIBIT INDEX