E-FILED
Wednesday, 25 November, 2026 10:48:04 AM
Clerk, U.S. District Court, ILCD

FILED
NOV 25 2026
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

NICO D. GAY, Plaintiff,

v.

CITY OF ROCK ISLAND; ADAM BRADLEY; BRIEANNE LONERGAN; ANDREW LAWLER; THOMAS DANHOF; and BRIAN KOZAK, Defendants.

Case No. 4:25-cv-04193-SLD-RLH

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

## I. INTRODUCTION

Plaintiff Nico D. Gay, proceeding pro se, opposes Defendants' November 13, 2026 Rule 12(b)(6) motion to dismiss the Second Amended Complaint. The operative Second Amended Complaint ("SAC," ECF No. 25) alleges that Plaintiff's warrantless arrest and ensuing detention were unsupported by probable cause for aggravated discharge of a firearm or for the distinct prohibited-premises offense Defendants invoke as an alternative justification. The SAC further alleges individualized investigative and charging conduct, subsequent proceedings, and municipal liability. Plaintiff does not contend that police must prove every statutory element beyond a reasonable doubt before arrest, perform an accounting audit, or accept his assertion of innocence. He disputes that the facts then known to the responsible officers objectively supplied probable cause for either offense.

The September 30, 2026 order (ECF No. 24) considered the earlier amended complaint and concluded that witnesses' descriptions of The Gathering as a "bar," together with firearm possession and liquor licensure, permitted the inference that the premises qualified under 430 ILCS 66/65(a)(9). Order 12–14. The SAC adds the venue's sixteen-to-seventeen-month history

as an unlicensed event hall without alcohol service; its September 25, 2023 transition to an ordinary liquor license; the fact that October 28–29 was a Halloween event and the first public licensed opening; Bradley's and Lonergan's prior departmental involvement; Lonergan's pre-seizure statement to Lawler that the venue had a license "now"; and particular statements, video observations, and officer-specific communications at different times. SAC ¶¶7–12, 17–18, 23, 28–40, 73–88. Those allegations require assessment on the operative pleading rather than automatic application of the prior conclusion.

The motion also raises genuine, independent issues: a Fourth Amendment malicious-prosecution claim must connect the prosecution to a qualifying seizure; Monell requires municipal action that actually caused the injury; and qualified immunity protects objectively reasonable mistakes under clearly established law. Plaintiff addresses those issues directly. At minimum, the SAC's detailed allegations concerning Count I should not be dismissed by treating liquor licensure as a substitute for the offense-specific statutory condition.

## II. RULE 12(b)(6) STANDARD AND THE OPERATIVE PLEADING

The Court accepts well-pleaded allegations as true and draws reasonable inferences in Plaintiff's favor, without accepting conclusory legal labels. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). A complaint need not prove its case at pleading, although dismissal is proper when its allegations establish a dispositive defense. The SAC—not the former pleading—is operative. The prior order is interlocutory; Plaintiff respectfully asks the Court to apply the existing law to materially more specific allegations. See Fed. R. Civ. P. 54(b).

The Halloween event is already pleaded in SAC ¶11. To clarify, Plaintiff attended that organized event at his sister's request to assist her; he did not enter merely to patronize a conventional tavern. That explanation is consistent with SAC ¶¶7, 11, 18, 23 and 88, but

Plaintiff does not assert it was known to arresting officers or use it to replace a missing necessary allegation. See Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (consistent elaboration in dismissal briefing). Allen's description of the occasion as a first public opening for licensed service is acknowledged; it was also a Halloween party at an established event venue. Neither characterization establishes the percentage of receipts during the preceding three months. The body-camera record further confirms Allen remained with Lawler and Lonergan during Plaintiff's firearm-possession and CCL discussion, while directing staff to leave. That detail elaborates the pleaded encounter, SAC ¶¶19–29, rather than introducing a new basis of liability.

## III. ARGUMENT

### A. COUNT I: THE SAC PLAUSIBLY CHALLENGES PROBABLE CAUSE AT THE RELEVANT TIMES

#### 1. Section 65(a)(9) does not equate liquor licensure with prohibited-premises status.

The legislature did not forbid licensed firearm carry at every premises selling alcohol. Section 65(a)(9) describes an establishment serving alcohol "if more than 50% of the establishment's gross receipts within the prior 3 months" came from alcohol sales. 430 ILCS 66/65(a)(9). A restaurant, banquet hall, wedding venue, or event hall can serve alcohol without necessarily satisfying that condition. The statute's objective receipts classification is therefore material, not an optional refinement of an offense consisting simply of "gun plus bar." A witness's informal description as a bar may be circumstantial information but does not itself reveal a financial percentage. See also People v. Gerger, 2026 IL App (1st) 240060, ¶24 (declining, after conviction on a different liquor-premises offense was vacated, to substitute §65(a)(9) where the record lacked proof of the receipts percentage). Gerger addresses proof and conviction, not the lower arrest threshold, and is cited only to underscore the statutory distinction. Plaintiff

does not ask the Court to require documentary receipts before any arrest; he asks whether the circumstances made this particular inference objectively reasonable.

The SAC alleges The Gathering previously hosted birthdays, graduations, and entertainment events without a liquor license or alcohol service for approximately sixteen or seventeen months. Its ordinary license was issued September 25, 2023. Allen described the October 28–29 Halloween party as its first opening to the public for licensed service. SAC ¶¶7–12; Ex. D4. The October event was itself a specific organized celebration, consistent with the premises' historical event-hall use, rather than evidence of months of predominant tavern revenue. Nor does the SAC say The Gathering looked or had the reputation of an ordinary neighborhood bar: Lawler's body camera showed signage advertising "THE GATHERING—EVENTS COMING SOON!" and other events, with no standard firearm-prohibition sign visible. SAC ¶18; Ex. A7. Plaintiff does not ask the Court to infer unseen interior features or unwritten financial numbers from that footage.

The motion contends that Plaintiff must supply figures proving the percentage was below 50%. MTD 7–8. That reverses the relevant inquiry. Plaintiff alleges on information and belief that the threshold was not satisfied, SAC ¶75, while expressly acknowledging the available records do not prove a percentage, ¶12. The question for false arrest is what facts then reasonably supported a belief that the legally defined offense occurred. It is not whether Plaintiff presently possesses the owner's private accounting records disproving the offense. Conversely, the lack of records alone does not eliminate probable cause; the total circumstances must be evaluated.

**2. Participating officers' alleged prior familiarity materially qualifies the witnesses' descriptions.**

Unlike police encountering a previously unknown, longstanding nightclub, Bradley and Lonergan had participated in the April 23, 2023 investigation concerning The Gathering while

it operated without a liquor license. Bradley personally investigated, reviewed surveillance, and prepared a report. SAC ¶¶8–10; Exs. B1–B5.

The SAC expressly pleads their familiarity with the earlier event-venue operations on information and belief, not as proven personal knowledge of receipts. Most significantly, before Plaintiff was even stopped, Lonergan expressly told Lawler that The Gathering had a liquor license "now." SAC ¶¶17, 76. Lawler heard the change-in-status statement, encountered the event signage and locked entrance, and heard Allen say Plaintiff was "supposed to be here." SAC ¶¶17–23, 82–83.

At approximately 2:22:50 a.m., Allen told Danhof that he had only recently obtained his license following a longstanding dispute with the City; this was before Lawler announced arrest. SAC ¶¶40, 79. Danhof's statement is not alleged to have been expressly relayed to Lawler before the announcement. Likewise, Ronk heard that it was like the first day open, but the SAC does not claim he relayed that information to Lawler before arrest. SAC ¶¶34, 40, 82, 88. These carefully pleaded limitations distinguish individual awareness from unproved universal knowledge. Bradley's supervisory role and coordination with Lawler and Lonergan matter, but his later charging direction cannot be projected backward as an earlier arrest command.

The motion itself acknowledges that the allegations "may establish that some officers knew about the establishment's transition to licensed operations." MTD 7. That is a qualified litigation acknowledgment, not a stipulation that all officers knew Allen's full history. Nevertheless, the defense then treats the history as immaterial unless officers possessed figures definitively proving the threshold unmet. That misses the narrower argument: the participating officers' alleged familiarity with The Gathering's event-hall operations and recently obtained license materially qualifies outsiders' "bar" descriptions. Restaurants, bowling alleys, wedding venues, and banquet halls can serve alcohol without meeting §65(a)(9)'s receipts threshold. If

a "bar" label suffices despite such qualifying information, what meaning remains for the legislature's distinction between alcohol-serving and predominantly alcohol-funded establishments? The owner's conduct adds context: §65(a)(9) obligates owners of qualifying premises to prohibit concealed firearms, and §65(d) requires entrance signs. Allen allegedly recognized Plaintiff's CCL and presence without denying entry, and the entrance lacked a standardized sign. Neither fact overrides a statutory prohibition or establishes actual receipts; both inform whether officers could reasonably infer that The Gathering qualified and that Plaintiff knowingly entered prohibited premises. The Court should evaluate these facts together, without requiring an accounting audit or treating an informal label as dispositive. Courts may attribute information among genuinely cooperating, communicating officers in the appropriate circumstances, but not mechanically impute every uncommunicated statement. Torry v. City of Chicago, 932 F.3d 579, 587–88 (7th Cir. 2019). Here, Lonergan's direct communication to Lawler removes any need to infer transmission of that particular fact; other information must be attributed according to the pleaded timing and communications. This same discipline should apply to favorable and unfavorable information.

**3. People v. Lyke is distinguishable and does not prescribe automatic classification by label.**

The Court previously relied on People v. Lyke, 2021 IL App (1st) 170371-U, ¶¶32–33. Order 13–14. Lyke was an Illinois Rule 23 nonprecedential disposition addressing facts materially different from the SAC. At Ice nightclub, Mathis was a bouncer charged with enforcing entry rules. He personally discovered an armed patron, denied entry, told police about the attempted armed entry, and identified the person if he returned. The appellate court discussed the officers' reasonable suspicion for an initial Terry stop, subsequent frisk and discovery of a weapon, and probable cause thereafter. Id. ¶¶32–38. That court considered the bouncer's actual enforcement of the entry restriction part of the basis for assuming the nightclub fell within a prohibited

category. Here the witnesses near a Chinese food stand were not employees, bouncers, or persons enforcing entry rules. They reported a yellow-jacketed man drawing a gun after hearing shots and entering The Gathering; they did not report warning him, denying entry, knowing the premises' alcohol receipts, or seeing him fire. SAC ¶¶14–16. Allen, the owner, did not tell police that he denied armed entry. He told Lawler Plaintiff was supposed to be there, and told Bradley and Danhof Plaintiff held a CCL and was not involved in the shooting. SAC ¶¶23, 32, 78. The venue also had the event-hall history and recent-license allegations absent from Lyke. These are not minor factual embellishments: they go to the apparent unlawfulness of the entrance and to the reliability of classifying the venue under paragraph (9).

Plaintiff acknowledges Lyke's statement that officers can make practical inferences and need not independently audit a nightclub. But Lyke did not hold that every licensed event venue casually called a bar is prohibited, even where information available to police qualifies that description and no owner or employee denied entry. It also cannot substitute reasonable suspicion for probable cause where the asserted seizure became an arrest. The Court should address these differences before treating Lyke as dispositive.

**4. The knowledge element, statutory signage, and owner's duty require separate consideration.**

Section 65(a) prohibits a CCL holder from "knowingly" carrying a firearm into specified premises. Plaintiff's knowing possession of his own firearm is undisputed, as is his possession of a valid CCL. The distinct question is what knowledge of the material circumstances establishing prohibited status the statute requires and what facts reasonably suggested that Plaintiff had it. Illinois law distinguishes awareness of factual circumstances from knowledge that those circumstances violate the law. 720 ILCS 5/4-3(b), (c), 4-5(a). Plaintiff does not contend he had to know the statute's number or compute the precise receipts percentage.

In People v. Ramirez, 2023 IL 128123, ¶¶22–25, the Illinois Supreme Court construed a different firearm statute to require knowledge of defacement because that circumstance transformed otherwise lawful possession into a criminal offense. Ramirez does not expressly decide the scope of "knowingly" in §65(a)(9). Its statutory reasoning nevertheless supports examining whether the mens rea encompasses awareness of the material circumstance that renders licensed entry unlawful, rather than stopping at proof of knowing possession and entry. The legislature separately directed owners of qualifying alcohol-receipts establishments not to knowingly fail to prohibit concealed firearms, subjecting them to the penalty under 235 ILCS 5/10-1(c-5). 430 ILCS 66/65(a)(9). And §65(d) requires conspicuous standardized prohibition signs at entrances; 20 Ill. Admin. Code §1231.150(d) specifically states that signs are to provide notice to persons entering prohibited premises. The owner's failure to post a sign does not itself waive a statutory prohibition or conclusively establish that the venue failed to qualify. But the notice scheme is probative where the legal classification depends on private business receipts not ordinarily accessible to entrants.

SAC ¶¶18, 23, 28–32 and 88 allege no standardized entrance sign, no owner or staff warning, Plaintiff's understanding of the premises as an event hall, his verified CCL, and Allen's recognition that he belonged there and held a carry license. There is no alleged bouncer denial like Lyke. In the November 1 Morris memorandum approved by Chief Landi, Morris reported Allen's acknowledgment of Plaintiff's CCL and possession, treated alcohol service broadly as prohibited, yet also quoted the receipts-dependent owner provision, 235 ILCS 5/10-1(c-5). SAC ¶64; Ex. D3. The latter was a post-arrest document, not information retroactively available to Lawler, but it reinforces the distinct legal and notice questions. The memorandum does not establish Allen was actually fined under the quoted provision.

The defense argues these circumstances do not negate probable cause. MTD 8. Plaintiff does not assert that any one circumstance necessarily defeats it. Taken together, however, they call

into question an inference that Plaintiff knew The Gathering met the receipts-dependent classification. A valid license is not immunity from place restrictions; likewise a licensee's entry into an alcohol-serving venue is not by itself evidence of knowledge of a revenue-dependent prohibition.

**5. Probable cause permits inference, not replacement of a statutory condition; reasonable investigation matters until cause exists.**

Probable cause concerns practical probabilities, not certainty; officers need not eliminate innocent explanations. District of Columbia v. Wesby, 583 U.S. 48, 56–61 (2018). But "[r]easonable avenues of investigation must be pursued especially when ... it is unclear whether a crime had even taken place." BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986). Beauchamp v. City of Noblesville, 320 F.3d 733, 743–44 (7th Cir. 2003), protects officers from an indefinite investigation once trustworthy information has established probable cause. The rule does not answer the disputed predicate question—whether probable cause was established here.

People v. Aguilar, 2013 IL 112116, and People v. Bloxton, 2020 IL App (1st) 181216, ¶¶19–25, underscore that firearm possession after Aguilar is not automatically criminal. Those cases do not decide §65(a)(9), and here officers had more than a bare gun observation: gunshots had occurred, witnesses identified Plaintiff's clothing, and he entered a venue some called a bar. Yet those additional facts require a distinct inquiry into discharge and a particular prohibited-premises classification. Madero v. McGuinness, 97 F.4th 516, 522–24 (7th Cir. 2024), likewise requires evaluation of the totality, including evidence favoring the suspect, but upheld reliance on credible eyewitnesses and does not impose a duty to exhaust every lead.

Allen was not merely somewhere at the scene. The SAC alleges that Allen opened The Gathering to Lawler and Lonergan and identified Plaintiff as someone who was "supposed to be here" while Plaintiff, initially handcuffed inside, was still handcuffed outside at the rear of

the establishment, before being escorted around front. SAC ¶¶19–23. As consistent elaboration of that encounter, the body-camera recording shows Allen present with Lawler and Lonergan while Plaintiff disclosed his CCL; Lawler stated at approximately 2:10:10 a.m. that nobody accused Plaintiff of shooting but someone had seen him with a gun, and Lonergan repeated the distinction in substance. Allen also directed staff to leave. SAC ¶¶23, 26, 28–29; Exs. C1–C2. Before Lawler's 2:24:37 a.m. arrest announcement, officers repeatedly had direct access to Allen, the owner, to clarify the venue's earlier event-hall operations, recent licensing transition, posted firearm restrictions, and whether Plaintiff had been warned or denied armed entry. These inquiries bear on the specific receipts-dependent offense, not on an unlimited audit or an assertion that owner permission nullifies a statute. See BeVier v. Hucal, 806 F.2d 123, 127–29 (7th Cir. 1986).

**6. Lawler's announced arrest and subsequent detention must be evaluated at the relevant times.**

The initial investigative stop at approximately 2:08:24 a.m. followed gunfire and witnesses identifying someone armed and wearing clothing similar to Plaintiff's. SAC ¶¶13–23. Plaintiff identifies Lawler's express arrest announcement at approximately 2:24:37 a.m., and the ensuing custody, as the principal arrest challenged in Count I. Alternatively, if the Court concludes that the preceding handcuffing, firearm seizure, movement, and continued restraint, considered together, exceeded the permissible scope of a temporary investigative detention, Plaintiff preserves a de facto-arrest theory requiring probable cause at the point that threshold was crossed. The inquiry turns on the scope, duration, safety justification, and investigative diligence under the circumstances; handcuffing alone does not automatically transform a Terry stop into an arrest. Terry v. Ohio, 392 U.S. 1, 20–27 (1968); United States v. Bullock, 632 F.3d 1004, 1015–16 (7th Cir. 2011); United States v. Stewart, 388 F.3d 1079, 1084–85 (7th Cir. 2004). This alternative does not displace the 2:24:37 a.m. announcement as Plaintiff's principal

theory or attribute later-acquired evidence to an earlier restraint. That preceding period matters because additional information emerged before the announced arrest: by approximately 2:11 a.m., Lonergan had confirmed Plaintiff's valid FOID and CCL; Lawler and Lonergan had distinguished reported possession from any accusation Plaintiff fired; Bradley had reviewed Sanchez-Poata's recording; and Lawler had viewed Bradley's still depicting Plaintiff with his firearm pointed down. SAC ¶¶21–33, 38–44.

The civilian recording captured a flash associated with gunfire in Arts Alley and later depicted Plaintiff crouching for cover across Second Avenue with his firearm pointed downward, without showing Plaintiff fire. Although a camera's frame does not encompass everything its operator can personally observe, Ronk's report independently documented Sanchez-Poata's eyewitness account that he did not see the person holding the pistol fire when he was able to observe him. SAC ¶¶24–27. Plaintiff alleges that this firsthand observation, the recording, the witnesses' descriptions of other suspected shooters, and the geographic separation collectively undermined probable cause to believe Plaintiff discharged a firearm. Ronk approached Lawler at approximately 2:24:21 a.m., stating that he had uploaded video and suspect photographs; the SAC does not allege he relayed every detail of Sanchez-Poata's statement during that exchange. SAC ¶¶41–43. The separately disputed §65(a)(9) theory must therefore be assessed on its own factual basis as of Lawler's express announcement.

During continued custody, the officers learned more. Bradley and Ronk had already reviewed the recording when Danhof interviewed Lopez at approximately 2:31:30–2:33:02 a.m. Lopez located the hooded individuals associated with gunfire in Arts Alley and could not identify the shooter's face. At approximately 2:34:55–2:35:02 a.m., Danhof relayed a stronger "same guy" identification to Bradley and Lawler; Bradley stood near Danhof during the approximately 2:35:49 a.m. call with Lonergan and later directed aggravated-discharge processing. SAC ¶¶24, 27, 45–50; Exs. A12, A14, A19–A25, C3–C4. These events are relevant to whether

continued custody remained justified, without attributing later knowledge retroactively to Lawler at 2:24:37 a.m. See Hebron v. Touhy, 18 F.3d 421, 423 (7th Cir. 1994).

**7. Devenpeck allows an objectively supported alternative offense, not a post hoc factual foundation.**

Plaintiff acknowledges Devenpeck v. Alford, 543 U.S. 146, 153–55 (2004), and Ramos v. City of Chicago, 716 F.3d 1013, 1018 (7th Cir. 2013). An officer's stated reason is not controlling if the facts available at arrest supplied probable cause for another offense. Thus probable cause for §65(a)(9), if objectively present then, could defeat false arrest notwithstanding the original aggravated-discharge explanation. Plaintiff challenges the antecedent condition: the SAC alleges neither offense was sufficiently supported at the relevant time. The defense cannot invoke a later charge to backfill missing historical facts.

The initial custody was processed for aggravated discharge. At approximately 4:24 a.m., Kozak said that charge would be replaced with a prohibited-place offense, explaining the theory in terms of "a bar where they sell alcohol." SAC ¶¶52–56. The Notice to Appear cited §65(a)(11), concerning specified special-event retailer or special-use licenses; the later November Information charged §65(a)(9), concerning the different receipts condition. SAC ¶¶58, 65, 81. The SAC identifies an ordinary license rather than the qualifying special license under paragraph (11).

These shifts do not prove intentional fabrication or that the legal basis was first contemplated at 4:24; Lonergan had asked about carrying in a bar at 2:16. They do make the actual investigative chronology relevant, while requiring independent factual justification for any alternative offense.

**8. The SAC alleges individual rather than title-based involvement.**

Lawler personally stopped, handcuffed, and announced Plaintiff's arrest after hearing Lonergan's "now" statement and Allen's acknowledgment. Lonergan conducted the license

checks, actively assisted the seizure, transported and held Plaintiff, explained its shooting-scene basis, and sought and received charging instructions. Bradley reviewed the video, distributed the still, communicated during the coordinated investigation, and directed later aggravated-discharge processing. Danhof had distinct owner and witness information and relayed the contested identification during continued custody. SAC ¶¶82–86. Liability requires proof of each defendant's own causally significant acts, not supervisory status alone. See Acevedo v. Canterbury, 457 F.3d 721, 723 (7th Cir. 2006). Plaintiff acknowledges that Danhof's clearest identified causally significant statements occurred later, and that Bradley's later direction is not itself an initial-arrest order. Whether each person's acts caused an unlawful seizure should be analyzed individually, rather than rejecting every participant because Lawler pronounced the arrest.

## B. COUNT II: MALICIOUS PROSECUTION AND THE SEPARATE SEIZURE QUESTION

### 1. The prosecution-based seizure requirement requires independent treatment.

Defendants argue that the October arrest and booking preceded the November Information and July 2024 refiling, so neither prosecution caused a later seizure. MTD 10–11. The Fourth Amendment framework requires consideration of whether legal process caused a qualifying deprivation of liberty, a question separate from malice or lack of probable cause. Manuel v. City of Joliet, 580 U.S. 357, 367–72 (2017); Thompson v. Clark, 596 U.S. 36, 42–44 (2022). Neita v. City of Chicago, 148 F.4th 916, 939–40 (7th Cir. 2025), requires a qualifying prosecution-caused seizure; even strong allegations of wrongful initiation cannot eliminate that element.

The SAC alleges warrantless arrest, Post 2 custody and processing, release on a Notice to Appear, the November 6 Information, and the July 2024 refiling. SAC ¶¶43–58, 65–70. Plaintiff maintains that the reports, sworn charging allegations, omissions, and later

proceedings warrant individualized assessment as to their causal and constitutional significance. The initial arrest and its aftermath remain independently actionable, if unlawful, under Count I. Plaintiff preserves Count II and requests that, if the Court finds a prosecution-caused seizure insufficiently alleged, dismissal be without prejudice to an amendment supported by facts consistent with Rule 11.

**2. Distinct criminal theories, causation, and favorable termination.**

Unlike the any-offense rule for false arrest, malicious prosecution generally examines unsupported charges individually. Chiaverini v. City of Napoleon, 602 U.S. 556, 561–63 (2024). The initial Notice to Appear named §65(a)(11) and the November and July Informations concerned §65(a)(9). SAC ¶¶58, 65–69, 81. The ordinary City liquor license does not by itself satisfy the former subsection's specified special-licensing categories; the latter requires the distinct prior-three-month receipts condition. The final dismissal without leave on June 3, 2025 ended the renewed proceeding without conviction; the July 16, 2024 dismissal with leave was followed by refiling and should not be mischaracterized as an independently final termination. SAC ¶¶66–69, 107.

The Court's prior order found Kozak's July supplemental investigation plausibly causal to the July refiling. Order 18–20. Kozak adopted the §65(a)(9) receipts allegation in a notarized November 6 oath; the next day's hearing supplied further information concerning The Gathering's event-hall operations. The July sequence presents an especially specific theory: the State reported difficulty establishing qualifying receipts, Kozak had attended the prior hearing, obtained the ordinary liquor license and first-public-opening information, and issued a July 28 report that did not identify receipts proof or fully contextualize the earlier event-hall use. The State refiled on July 31, and subsequent prosecutorial explanations connected the supplemental reporting to refiling. SAC ¶¶59, 65–69, 97, 101–105. Plaintiff asks the Court to draw

Monell v. Department of Social Services, 436 U.S. 658, 690–94 (1978), permits liability for injury caused by official policy, a well-settled custom, or action attributable to an official final policymaker; it does not impose respondeat superior liability. Thomas v. Cook County Sheriff's Department, 604 F.3d 293, 303 (7th Cir. 2010). A custom theory ordinarily requires evidence beyond isolated conduct; a final-policymaker decision can sometimes involve one incident. Pembaur v. City of Cincinnati, 475 U.S. 469, 480–83 (1986). A failure-to-train theory ordinarily requires notice and deliberate indifference, subject to a narrow obvious-need exception. Connick v. Thompson, 563 U.S. 51, 61–64 (2011); Glisson v. Indiana Department of Corrections, 849 F.3d 372, 379–82 (7th Cir. 2017) (en banc).

Here the proposed deficiency is not merely that many people called The Gathering a tavern. It is the alleged institutional conflation of an ordinary liquor license or colloquial "bar" description with paragraph (9)'s precise receipts-dependent classification. Lonergan's question whether a gun could be carried in "a bar," Lawler's prohibited-tavern report, Kozak's explanation that an alcohol-serving bar was prohibited, and Morris's later memorandum all bear on that interpretation. SAC ¶¶109–115; Exs. C1–C3, C6, D3. Morris's memorandum quoted 235 ILCS 5/10-1(c-5), not 430 ILCS 66/65(a)(9); the two provisions reference the same receipts threshold. It also described alcohol service as categorically prohibited, notwithstanding the quoted percentage. This tension may support an inference of deficient application rather than an allegation that every official was ignorant of the statute.

Chief Landi approved Morris's post-arrest memorandum; Deputy Chief McCloud participated in nuisance correspondence; and Mayor Thoms issued a later licensing order. SAC ¶¶63–64, 113–

114. These allegations identify potentially relevant municipal decisionmakers and institutional responses. Plaintiff's theory is that later official documents and enforcement communications may evidence a previously operative approach conflating ordinary liquor licensure with

§65(a)(9)'s receipts-dependent prohibition. The policymaking status of the relevant officials, existence of a municipal practice, and causal relationship to October 2023 require analysis under City of St. Louis v. Praprotnik, 485 U.S. 112, 123–27 (1988), and Killinger v. Johnson, 389 F.3d 765, 771–72 (7th Cir. 2004), rather than an assumption that titles or later acts automatically establish a policy.

Plaintiff also alleges that a February 2026 FOIA request for relevant training materials produced a "No record" response. SAC ¶112; Ex. F1. Together with the alleged recurring treatment of CCL possession in alcohol-serving establishments as categorically prohibited, that response supports Plaintiff's request to examine the City's training, notice, and deliberate-indifference allegations under Connick and Glisson. The Court should assess the pleaded municipal theories independently if an underlying constitutional violation remains viable.

## D. COUNT IV: ALLEGED OPPORTUNITIES TO INTERVENE MUST BE OFFICER-SPECIFIC

An officer may be liable for failing to intervene when the officer knows or has reason to know another officer is violating constitutional rights and has a realistic opportunity to prevent the violation. Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994). The claim is derivative of an underlying violation but does not require the same defendant to have pronounced arrest. The SAC alleges that Lonergan verified Plaintiff's credentials, heard alternative shooter information, remained responsible for custody, and communicated with Bradley; that Bradley reviewed the video and received Allen's statement before later instructing continued aggravated-discharge processing; and that Danhof heard Lopez's inability to identify a shooter's face but relayed "the same guy" before further charging decisions. SAC ¶¶116–119. As to Lawler, direct arrest participation is Count I's principal theory; an alternative failure-to-intervene theory concerns later custody discussions. Kozak entered the investigation

substantially later and ultimately arranged release, leaving a narrow potential window for any omission to facilitate release. SAC ¶¶120–121. Plaintiff does not ask the Court to infer a realistic opportunity from mere presence or rank. If the Court finds any pleaded alternative insufficient as to a particular defendant, it should examine the others individually and distinguish direct participation from omission.

## E. COUNT V: STATUTORY INDEMNIFICATION IS DERIVATIVE

Count V seeks indemnification under 745 ILCS 10/9-102 for any qualifying compensatory judgment against a City employee acting within the scope of employment, not independent damages or punitive damages against the City. SAC ¶¶122–124. If any underlying individual claim survives, this derivative claim should remain to that extent. If none survives, Plaintiff recognizes the Court's prior conclusion that indemnification cannot proceed independently.

## F. QUALIFIED IMMUNITY REQUIRES A TOTALITY-OF-CIRCUMSTANCES AND OFFICER-SPECIFIC ANALYSIS

Qualified immunity remains distinct from actual probable cause. Even if actual probable cause was lacking, immunity applies where a reasonable officer possessing the same information could have believed probable cause existed under clearly established law. Abbott v. Sangamon County, 705 F.3d 706, 714–15 (7th Cir. 2013); District of Columbia v. Wesby, 583 U.S. 48, 63–68 (2018). Plaintiff does not rely on an abstract right to a reasonable arrest. His claim concerns an arrest based upon firearm possession at a particular venue without an objectively reasonable basis to conclude that the venue met §65(a)(9)'s receipts-dependent classification, considering the information and clarifying sources actually available to the officers.

In BeVier v. Hucal, 806 F.2d 123, 126–29 (7th Cir. 1986), an officer arrested parents for child neglect after observing conditions giving rise to suspicion, but the statute required knowing or willful parental misconduct. The officer knew the parents had sought medical care and obtained a babysitter. He failed to question the parents, babysitter, or medical personnel who

could readily clarify the apparent offense, and later disregarded a child-protection investigator's contrary assessment. The Seventh Circuit held the officer lacked probable cause and rejected qualified immunity: given the available facts and feasible inquiries, no reasonably well-trained officer could reach his conclusion. Id. at 127–29. The court assessed information and exigency together, recognizing that the scope of reasonable inquiry depends upon the danger and circumstances; it did not impose an unlimited duty to investigate.

The analogy is specific. In BeVier, appearances suggested wrongdoing but did not establish a material statutory circumstance, and readily available inquiries could clarify it. Here, a gun was reported, but §65(a)(9) does not ban licensed carry at every establishment with an ordinary liquor license; it requires more than half of the prior three months' gross receipts to derive from alcohol sales. SAC ¶¶7–12, 75. Section 65(a) also specifies "knowingly." Allen was positioned to clarify The Gathering's earlier events and revenue-generating operations, its recent licensed opening, posting and notice practices, and whether Plaintiff had been warned or denied armed entry. His permission would not supersede the statute if the statutory conditions actually applied, but his firsthand information bore directly on whether officers reasonably believed those conditions and the relevant notice were present.

The opportunity was unusually direct and repeated. Lonergan told Lawler at 2:06:44 a.m. that the venue had its license "now," and Lawler observed event signage without a visible standardized prohibition sign. Allen opened the establishment, and, after Plaintiff was initially handcuffed inside and escorted outside to the rear, remained beside Lawler and Lonergan while Plaintiff was still handcuffed. Allen said Plaintiff was "supposed to be here," was present when Plaintiff disclosed his CCL, and directed staff home. At approximately 2:10:10 a.m. Lawler distinguished witnesses seeing Plaintiff with a gun from accusing him of firing it; Lonergan reiterated that distinction. Lonergan subsequently confirmed Plaintiff's FOID and CCL and raised the question of carrying in a bar. SAC ¶¶17–29, 76–78; Exs. A7, C1–C2.

Officers could have promptly asked Allen about the venue's actual operations and restrictions before relying on §65(a)(9).

Nor did the investigation end there. Bradley reviewed Sanchez-Poata's recording, which captured a flash in Arts Alley and showed Plaintiff seeking cover across Second Avenue with his firearm down and no visible firing. Ronk reviewed the same recording and documented Sanchez-Poata's personal observation that he did not see the armed subject fire while he could observe him. Even when Plaintiff fell outside the phone's frame, the witness's own field of view and account remained separate evidence. Allen told Bradley and Danhof Plaintiff was licensed and uninvolved; Lonergan heard a different "white coat" description; Lawler saw a still showing possession, not discharge. SAC ¶¶21, 24–32, 36–39. Allen's later "just got it" account to Danhof and Ronk's separate first-opening information were not shown to have been transmitted to Lawler before his announced arrest. SAC ¶¶34, 40. Taken together, the favorable shooting evidence made the independent factual basis for a §65(a)(9) arrest particularly important.

People v. Lyke, 2021 IL App (1st) 170371-U, ¶¶32–38, is distinguishable in precisely this respect. There a nightclub bouncer enforcing entry restrictions discovered an armed patron, refused entry, reported the attempt, and identified the person. The court addressed the ensuing stop and weapon discovery. Here the Chinese-food-stand witnesses were not entry-rule enforcers, did not deny armed entry, and did not report knowing alcohol-receipts figures. The actual owner acknowledged Plaintiff belonged there and was accessible to answer factual questions; event signage, the newly obtained ordinary license, and the documented pre-license event-hall use further qualified the generic "bar" label. Lyke allows commonsense inference without an audit, but neither Lyke nor BeVier establishes that a colloquial label invariably supplies the separate statutory condition.

Plaintiff recognizes the limiting rule: officers may rely on sufficiently trustworthy information once probable cause has been established, without indefinitely pursuing exculpatory leads. Beauchamp v. City of Noblesville, 320 F.3d 733, 743–44 (7th Cir. 2003). Officers were responding to actual gunfire, and the initial reports justified investigation and safety precautions. The contested antecedent question is whether the §65(a)(9) offense had reached even arguable probable cause at the time of arrest, in light of what officers already knew and the accessible owner. If sufficient probable cause existed, no additional inquiry was compulsory; if it did not, BeVier explains why declining feasible, material clarification may be objectively unreasonable rather than merely imperfect police work.

Individual timing also matters. Lawler encountered the signage, heard Lonergan's "now" statement, spoke with Allen, restrained Plaintiff, and announced arrest. Lonergan verified credentials, raised the bar question, participated in custody, and communicated with Bradley. Bradley reviewed Adrian's video, received Allen's statements, and later directed aggravated-discharge processing. Danhof received the recent-license account and subsequently interviewed Lopez. SAC ¶¶82–87. After arrest—but before Bradley's charging direction—Lopez described the hooded individuals and shooting in Arts Alley and acknowledged he could not identify the shooter's face; Danhof then conveyed an apparently stronger "same guy" identification to Bradley and Lawler. Bradley's earlier video review and Ronk's examination supplied another source concerning the shooting's location. By Bradley's approximately 2:35:49 a.m. call to Lonergan, the account, relay, and video information must be considered in assessing the reasonableness of continued detention, while distinguishing each officer's actual knowledge from uncommunicated details. Plaintiff does not contend that weakened shooting suspicion alone required release if §65(a)(9) independently supplied probable cause; he separately disputes that predicate. These later events do not govern Lawler's earlier arrest announcement. BeVier, 806 F.2d at 128, recognizes the constitutional

significance of continued detention after newly learned facts dissipate earlier probable cause. SAC ¶¶24, 27, 46–49; Exs. A12, A14, A19–A25, C3–C4.

Neita v. City of Chicago, 148 F.4th 916, 926–36 (7th Cir. 2025), subsequently applied BeVier to arguable probable cause. Because Neita postdates the October 2023 encounter and arose from an anonymous tip rather than the eyewitness reports here, Plaintiff relies on it only for its explanation of preexisting BeVier principles, not as law newly established in 2025. Any mistake of law must likewise be objectively reasonable, not a categorical substitution of liquor licensure for the express statutory condition. Heien v. North Carolina, 574 U.S. 54, 61–67 (2014). At Rule 12(b)(6), the Court should assess the officer-specific alleged facts in Plaintiff's favor and should not grant qualified immunity merely by omitting the readily available qualifying circumstances from the probable-cause analysis.

## G. STATE-LAW ARGUMENTS AND DISMISSAL WITH PREJUDICE

The SAC expressly pleads federal Counts I–IV and derivative Illinois statutory indemnification in Count V. It does not plead a separately numbered Illinois common-law malicious-prosecution, false-arrest, false-imprisonment or negligence count. SAC ¶¶71–124. Plaintiff does not purport to create such a count by opposing dismissal, and the Court need not decide an unpleaded tort or an advisory limitations issue. Nor does the Fourteenth Amendment reference alone convert Count II into a distinct due-process malicious-prosecution claim. See Newsome v. McCabe, 256 F.3d 747, 750–51 (7th Cir. 2001).

Defendants request dismissal of Counts I–IV with prejudice. MTD 20–21. Plaintiff has already amended and does not assume automatic entitlement to further leave. Nevertheless, if the Court identifies a curable pleading deficiency, Plaintiff requests that it apply Rules 15(a)(2) and 54(b), consider a specifically supportable amendment rather than speculative facts, and avoid a futility determination unsupported by the actual defect. See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana, 786 F.3d 510, 519–20 (7th Cir. 2015).

If the Court finds a deficiency particular to any count or defendant, Plaintiff requests that the ruling identify that deficiency, preserve independently sufficient claims, and permit a good-faith amendment where the facts can cure it. Fed. R. Civ. P. 15(a)(2); Runnion, 786 F.3d at 519–20.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss Counts I, II, III, and IV and permit Count V, statutory indemnification, to proceed to the extent an underlying individual-officer claim survives. In particular, Count I's alleged unconstitutional arrest and continued detention and Count IV's officer-specific failure-to-intervene allegations should be evaluated on the totality of each officer's acts, knowledge, communications, and realistic opportunities. Alternatively, if any claim or defendant is found insufficiently pleaded, Plaintiff asks the Court to limit dismissal to that portion, dismiss without prejudice where appropriate, and allow amendment if a factually and legally supportable cure exists. Plaintiff requests such further relief as is just and proper.

Respectfully submitted,
/s/ NICO D. GAY Nico Gay

Nico D. Gay
1841 13th Street, Moline, IL 61265
nico.gay.ng1@gmail.com
309-350-9178
Date: November 25, 2026

## CERTIFICATE OF COMPLIANCE WITH CIVIL LOCAL RULE 7.1(B)(4)

I certify that the foregoing response memorandum contains 6,854 words, including headings, quotations, and footnotes, as calculated using Google Docs, and does not exceed the 7,000-word limitation of Civil Local Rule 7.1(B)(4).

/s/ NICO D. GAY
Nico D. Gay
1841 13th Street, Moline, IL 61265
nico.gay.ng1@gmail.com
309-350-9178
Date: November 25, 2026

FILED
NOV 25 2026
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

NICO D. GAY, Plaintiff,
v.
CITY OF ROCK ISLAND; ADAM BRADLEY; BRIEANNE LONERGAN; ANDREW LAWLER; THOMAS DANHOF; and BRIAN KOZAK, Defendants.

Case No. 4:25-cv-04193-SLD-RLH

## CERTIFICATE OF SERVICE

I certify that on November 25, 2026, I served a copy of Plaintiff's Response in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint and its attached Certificate of Compliance on counsel for Defendants, Leslie M. Day, City Attorney, by USPS Priority Mail, postage prepaid, addressed to 1528 3rd Avenue, Rock Island, IL 61201. On the same date, I also emailed a courtesy copy to day.leslie@rigov.org.

/s/ NICO D. GAY
Nico D. Gay
1841 13th Street, Moline, IL 61265
nico.gay.ng1@gmail.com
309-350-9178
Date: November 25, 2026